# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  HON. THOMAS J. AQUILINO, JR., SENIOR JUDGE**

| | |
|---|---|
| **GLOBE SPECIALTY METALS, INC. and MISSISSIPPI SILICON LLC,** ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | **Court No. 21-00231** |
| **UNITED STATES,** ) ) | **PUBLIC VERSION** |
| Defendant. ) ) | |

## PLAINTIFFS' BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Adam H. Gordon
Jennifer M. Smith
Ping Gong
Lauren Fraid
**THE BRISTOL GROUP PLLC**
1707 L Street, N.W.
Suite 570
Washington, DC 20036
T: (202) 991-2700
E: adam.gordon@bristolgrouplaw.com
*Counsel to Globe Specialty Metals, Inc. and Mississippi Silicon LLC*

Dated: October 5, 2021

**TABLE OF CONTENTS**

**Page**

**INTRODUCTION**................................................................................1

**STATEMENT PURSUANT TO RULE 56.2**.......................................2

1. The Administrative Determination Under Review ...........................2

2. Statement of the Issues.....................................................................3

**STANDARD OF REVIEW** ................................................................5

**STATEMENT OF FACTS** .................................................................5

**ARGUMENT**....................................................................................14

I. LEGAL FRAMEWORK ...................................................................14

    A. Application of Facts Available with Adverse Inferences When a Respondent Withdraws from a Proceeding ...........................................14

    B. Calculating Normal Value Using Constructed Value ................17

    C. Petitioner's Evidentiary Burden When Filing a Petition.............18

II. USING FERROGLOBE'S FINANCIAL STATEMENTS TO CALCULATE THE FINANCIAL RATIOS WHEN CALCULATING NORMAL VALUE BASED ON CONSTRUCTED VALUE IS NEITHER SUPPORTED BY SUBSTANTIAL EVIDENCE NOR ADEQUATELY EXPLAINED...................................................19

    A. Elkem's Financial Statements Represent a Superior Source for Calculating the Financial Ratios Used in the CV-Based NV ................19

        1. Both Elkem and Ferroglobe Are Third Country Sources ..................19

        2. Elkem's Business Activities Better Reflect the Financial Experience of a Company Dedicated to the Production of Identical and Comparable Merchandise ...............22

        3. Elkem Was Profitable During the Applicable Fiscal Year, Whereas Ferroglobe Was Not, and, When Available, Commerce Has a Clear Preference for Basing Financial Ratios on Companies That Are Profitable.................24

        4. Commerce's Explanations for Not Using the Highest Margin from the Petition Are Unavailing and Contrary to Its Practice .................28

**CONCLUSION** .................................................................................31

# TABLE OF AUTHORITIES

## CASES

*Am. Silicon Techs. v. United States*,
   261 F.3d 1371 (Fed. Cir. 2001) ............................................................. 34

*BMW of North America LLC v. United States*,
   437 F. Supp. 3d 1336 (Ct. Int'l Trade 2020) ...................................... 36

*Catfish Farmers of Am. v. United States*,
   36 CIT 1441 (Ct. Int'l Trade 2014) (not reported in F. Supp. 3d),
   *aff'd*, 645 F. App'x 1001 (Fed. Cir. 2016) ......................................... 26

*Catfish Farmers of America v. United States*,
   641 F.Supp.2d 1362 (2009) .................................................................. 27

*Consolo v. Federal Maritime Comm'n*,
   383 U.S. 607 (1966) .............................................................................. 34

*F.Lli De Cecco Di Filippo Fara S. Martino S.P.A. v. United States*,
   216 F.3d 1027 (Fed. Cir. 2000) ............................................................. 5

*Husteel Co., Ltd. v. United States*,
   180 F. Supp. 3d 1330 (Ct. Int'l Trade 2016),
   *aff'd*, 710 Fed. Appx. 890 (Fed. Cir. 2018) ...................................... 24

*King Supply Co., LLC v. United States*,
   674 F.3d 1343 (Fed. Cir. 2012) ............................................................. 5

*Mid Continent Steel & Wire, Inc. v. United States*,
   273 F. Supp. 3d 1348 (Ct. Int'l Trade 2017), *aff'd in part*,
   941 F.3d 530 (Fed. Cir. 2019) .............................................................. 23

*NMB Singapore Ltd. v. United States*,
   557 F.3d 1316 (Fed. Cir. 2009) ............................................................. 5

*POSCO v. United States*,
   378 F. Supp. 3d 1348 (Ct. Int'l Trade 2019) ...................................... 36

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ..................................................................... 5

19 U.S.C. § 1673a(c)(1)(A)(i) .................................................................... 19

19 U.S.C. § 1677b(e) ..................................................................................... 6

19 U.S.C. § 1677b(e)(2)(B) ........................................................................ 19

19 U.S.C. § 1677b(e)(2)(B)(iii) ...................................................................24

19 U.S.C. § 1677e(b) ........................................................................13, 15

19 U.S.C. § 1677e(c)..........................................................................17, 35

19 U.S.C. § 1677e(c)(1).............................................................................17

19 U.S.C. § 1677e(d)(3).............................................................................17

## ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*Aluminum Wire and Cable from the People's Republic of China: Final Affirmative
Determination of Sales at Less Than Fair Value,*
84 Fed. Reg. 58,134 (Oct. 30, 2019)................................................. 33

*Certain Oil Country Tubular Goods From the Republic of Korea: Final Determination
of Sales at Less Than Fair Value and Negative Final Determination of Critical
Circumstances,*
79 Fed. Reg. 41,983 (July 18, 2014)................................................. 22

*Certain Oil Country Tubular Goods From the Republic of Turkey: Final Determination of
Sales at Less Than Fair Value and Affirmative Final Determination of Critical
Circumstances, in Part,*
79 Fed. Reg. 41,971 (July 18, 2014)................................................. 22

*Certain Steel Grating from the People's Republic of China: Final Determination of
Sales at Less than Fair Value,*
75 Fed. Reg. 32,366 (Jun. 8, 2010)............................................... 30, 31

*Certain Steel Nails From the Sultanate of Oman: Final Determination of Sales at
Less Than Fair Value,*
80 Fed. Reg. 28, 972 (May 20, 2015)................................................. 23

*Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty
Administrative Review; 2014-2016,*
83 Fed. Reg. 4,030 (Jan. 29, 2018)................................................. 23

*Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty
Administrative Review; 2016-2017,*
83 Fed. Reg. 58,231 (Nov. 19, 2018)................................................. 23

*Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty
Administrative Review; 2017-2018,*
84 Fed. Reg. 71,372 (Dec. 27, 2019)................................................. 23

*Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China:
Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative
Determination of Critical Circumstances,*
84 Fed. Reg. 32,707 (Jul. 9, 2019).................................................. 32

*Notice of Final Determination of Sales at Less Than Fair Value and Termination of*
  *Critical Circumstances Investigation: Electrolytic Manganese Dioxide from Australia*,
  73 Fed. Reg. 47,586 (Aug. 14, 2008) ........................................................ 27, 28, 29

*Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol*
  *From the Republic of Korea*,
  68 Fed. Reg. 47,540 (Aug. 11, 2003) ........................................................ 27, 28, 29

*Silicon Metal from Bosnia and Herzegovina and Iceland: Final Affirmative Determinations*
  *of Sales at Less Than Fair Value and Final Affirmative Determination of Critical*
  *Circumstances for Iceland*,
  86 Fed. Reg. 11,720 (Feb. 26, 2021) ........................................................ 2, 15, 20

*Silicon Metal From Bosnia and Herzegovina and Iceland: Preliminary Affirmative*
  *Determination of Sales at Less Than Fair Value*,
  85 Fed. Reg. 80,009 (Dec. 11, 2020) ........................................................ 12, 13, 14

*Silicon Metal From Bosnia and Herzegovina, Iceland, and Malaysia:  Initiation of*
  *Less-Than-Fair-Value Investigations*,
  85 Fed. Reg. 45,177 (Jul. 27, 2020) ......................................................... 10

*Welded Stainless Pressure Pipe from Thailand: Final Determination of Sales at Less*
  *Than Fair Value*,
  79 Fed. Reg. 31,093 (May 30, 2014) ......................................................... 16

## REGULATIONS

19 C.F.R. § 351.203 ......................................................................................7
19 C.F.R. § 351.308(c)..............................................................................15
19 C.F.R. § 351.308(d) .........................................................................17, 35

## MISCELLANEOUS AUTHORITIES

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
  H.R. Doc. No. 103-316 (1994) ........................................................... passim

iv

**INTRODUCTION**

This appeal involves the bureaucratic (and human) instinct to defend a past decision, even when it is obviously incorrect.  In the case below, during the first weeks after the underlying Petition was filed, Commerce's initiation team – diligently working under significant time pressure given short deadlines and a large workload – incorrectly revised the Petition's amended margin calculation (39.00 percent) to use data from a company whose overall operations are much different than production of the merchandise under consideration, and, of greater concern, that suffered a loss.  This is contrary to Commerce's long-standing practice, and generated a much lower margin (21.41 percent).  Moreover, the initiation team did this notwithstanding that the record since the beginning has included the financial statement from a profitable producer of identical merchandise, a far, far superior choice.

Ordinarily this would be of little moment, because, ordinarily, foreign producers that are investigated cooperate and receive a margin based on their individual pricing practices.  Here, however, the Bosnian respondent decided not to cooperate, and thus was assigned the margin from the Petition, based on Commerce's erroneous calculations.[1]

Plaintiffs respectfully challenged Commerce's error, whose significance was magnified given that the Bosnian producer stopped cooperating and the erroneous margin would be assigned to it as adverse facts available.  Commerce, however, dug in its heels over the course of the investigation, even though the investigation team (different from the initiation team) easily could have reviewed the calculations and corrected them for the final determination.

---

[1] It remains to be seen whether the Bosnian respondent elected not to participate after seeing the margin Commerce erroneously calculated, which it knew would be the rate assigned to it as total facts available with adverse inferences.

Plaintiffs fully appreciate the time pressure under which Commerce operates during the initial weeks of a case, when the agency must decide whether the statutory requirements for initiation of a case have been met.  Short deadlines and high workload, however, should not excuse an erroneous calculation decision, particularly when the consequences for a case become as significant as they are in the instant appeal.  Plaintiffs respectfully request that the Court reverse Commerce's unilateral calculation error and remand this case to allow the agency to correct its calculations for the final determination below.

## STATEMENT PURSUANT TO RULE 56.2

### 1.  The Administrative Determination Under Review

The administrative determination under review is the final determination in the U.S. Department of Commerce's ("Commerce") antidumping investigation of silicon metal from Bosnia and Herzegovina.  *See Silicon Metal from Bosnia and Herzegovina and Iceland: Final Affirmative Determinations of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances for Iceland*, 86 Fed. Reg. 11,720 (Feb. 26, 2021) (PR 70) ("*Final Determination*"), and accompanying Issues and Decision Memorandum ("Final IDM") (PR 61).[2]  The period of investigation ("POI") is April 1, 2019, through March 31, 2020.

---

[2] Documents on the public administrative record in this proceeding are referred to in this brief by the abbreviation "PR", followed by the document number assigned to them in the administrative record filed with the Court, *i.e.*, "PR __".  Documents on the confidential record are referred to by the abbreviation "CR", followed by the document number, *i.e.*, "CR __".

**2.   Statement of the Issues**

> **Whether Commerce's determination to rely on an adverse facts available rate calculated using an improper methodology is supported by substantial evidence or otherwise in accordance with law?**

No.  Commerce's use of an adverse facts available ("AFA") rate calculated using data from a company that suffered a loss and whose overall operations are dominated by highly different types of operations is not supported by substantial evidence and is in fact contrary to Commerce practice and record evidence.

The AFA margin used in the case below, 21.41 percent margin, is based on data from a company (plaintiff Globe Specialty Metals' ("GSM") parent, Ferroglobe PLC ("Ferroglobe")) that suffered a loss and whose financial results reflect activities, such as timber farming, coal and gravel mining, and production of hydroelectric power, that are completely different from the production of silicon metal.  This is entirely at odds with Commerce's long and well-established practice, and no reasonable explanation was given to justify the agency's departure from normal practice.

Even more troubling, since the day the Petition in the underlying case was filed, the record has contained the financial statement of a <u>profitable</u> producer of <u>identical</u> merchandise (Elkem ASA ("Elkem")) – submitted with the original petition and used to calculate all of the petition margins submitted by Plaintiffs below.  The data from Elkem, correctly reflecting the experience of a profitable company rather than a company injured by unfairly-traded imports, yielded a margin of 39.00 percent.

First, the source Commerce unilaterally used, Ferroglobe, experienced a loss during its 2019 fiscal year.  Commerce has a well-established and long-standing practice of not using financial statements of companies that suffered losses when there are viable alternatives

available that were profitable (*e.g.*, Elkem).  This makes sense, because a company experiencing

losses is a company in distress, whose data distort the calculations in obvious ways, contrary to

the goal of the statute.  Indeed, Ferroglobe and GSM both suffered losses, reflecting the very

dumping and injury that caused Plaintiffs to file the case below in the first place.

Second, Ferroglobe's financial statement reflects activities of a company predominantly

involved in a wide range of business activities wholly unlike the production of silicon metal,

such as timber farming, coal mining, and production of hydroelectric power, making its financial

experience fundamentally different and inappropriate for calculating the financial ratios of a

pure-play producer of silicon metal, like the Bosnian respondent R-S Silicon D.O.O. ("RSS")

and Elkem.  This is particularly true when a far superior alternative – the financial statement of

Elkem, a profitable company essentially dedicated to the production of silicon metal and highly

similar products such as ferrosilicon (produced using the same equipment, workers, raw

materials, and processes) – has been on the record since the first day of the underlying

investigation.

Third, Commerce's attempt to justify its decision to disregard Elkem's financial

statement – that Elkem is located in a third country (*i.e.*, not Bosnia or the United States) – is a

canard.  The company Commerce unilaterally chose to use, Ferroglobe, *also* is located in a third

country (the United Kingdom).

Considering the above three factors together, Commerce's decision to reject Elkem's

financial statements in favor of Ferroglobe is fundamentally flawed, contrary to the evidence,

and legally unsound.  The record clearly supports the use of Elkem's financial statement as the

only reasonable basis to calculate the financial ratios used in the constructed value calculation of

normal value in the petition, consistent with Commerce's practice.

## STANDARD OF REVIEW

In an appeal of an antidumping determination by Commerce, the agency's determination will not be upheld if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

While Commerce's determinations are entitled to substantial deference, such deference is not unlimited.  *See King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (citation omitted).  Where Commerce's determinations are not supported by substantial evidence – which is to say, are not reasonable – the agency's determinations will be reversed.  *See, e.g., F.Lli De Cecco Di Filippo Fara S. Martino S.P.A. v. United States*, 216 F.3d 1027, 1032-1033 (Fed. Cir. 2000).

## STATEMENT OF FACTS

On June 29, 2020, Plaintiffs filed a petition requesting that Commerce investigate whether imports of silicon metal from Bosnia and Herzegovina were sold in the U.S. market at less than fair value during the period April 1, 2019, through March 31, 2020.  *See Silicon Metal from Bosnia and Herzegovina, Iceland, the Republic of Kazakhstan, and Malaysia:  Petitions for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended, on Behalf of Globe Specialty Metals, Inc. and Mississippi Silicon LLC* (Jun. 29, 2020) (PR 1-11) ("Petition").[3]

---

[3] Petitions were also filed at the same time seeking investigations of silicon metal imports from Iceland, Kazakhstan, and Malaysia.  Like the underlying investigation of imports from Bosnia, each of these investigations led to affirmative determinations and antidumping or countervailing duty orders.  None of these proceedings and orders is involved in or implicated by this appeal.

Volume II of the Petition contained information detailing the calculation of the alleged dumping margin pertaining to imports of silicon metal from Bosnia and Herzegovina. *See id*. (PR 6-11). This calculation sought to compare the home market price or "normal value" of RSS's silicon metal to U.S. price for the same product. Because the price of a sale or offer to sell in Bosnia was not available, Plaintiffs based the normal value component of the margin calculation on constructed value in accordance with 19 U.S.C. § 1677b(e). *See id*. at 5-12 and Exhibits II-15 through II-25 (PR 6-11).

By law, calculating normal value using constructed value relied on three primary components. First was a buildup comprising the material, labor, and energy ("MLE") costs involved in producing the subject merchandise, such as electricity, gravel, coal, oxygen, and wood, as well as an offset for a by-product, silica fume. *See id*.

The second part of the constructed value buildup involved calculating financial ratios for factory overhead ("OH") and selling, general, and administrative expenses ("SG&A") in order to calculate the total cost of manufacturing ("COM") and the total cost of production ("COP"). As explained in the petition:

> To derive the total cost of manufacturing, Petitioners summed all of the direct material costs, energy and labor costs indicated above, offset the direct material costs for the silica fume by-product, and then added an amount related to manufacturing overhead based on a fixed manufacturing overhead ratio derived from the stand-alone 2019 audited financial statements for the Norwegian silicon metal producer Elkem ASA. To calculate the Bosnian producers' COP {(cost of production)}, Petitioners next added additional expenses to the total cost of manufacturing relating to selling, general and administrative expenses and interest expenses, which were also based on ratios derived from Elkem ASA's 2019 audited financial statements. *See* Exhibits II-15, II-23 and II-24. Petitioners were unable to obtain financial statements for the Bosnian producers. As Elkem ASA is a significant producer of silicon metal, ratios based on the company's 2019 financial statements capture the financial experience specific to the production of silicon metal and are a reasonable proxy for the financial experience of the Bosnian producers.

*See id*. at 10-11 (PR 6).

As the final part of the constructed value buildup, Plaintiffs added an amount for profit, which was also calculated from Elkem's 2019 audited financial statements, and an amount for packing materials, which was calculated using GSM's packing experience (*i.e.*, the actual amounts of various packing materials, such as bags, sacks, and pallets, used per short ton of silicon metal) valued using Bosnian values.  *See id*. at 11-12 (PR 6).  Comparing the constructed value normal value to the associated U.S. price resulted in an alleged margin of dumping of 62.65 percent in the Petition.

During the first 20 days after a petition is filed, Commerce reviews the petition to determine whether the requirements for initiating an investigation have been met. 19 C.F.R. § 351.203.  Commerce typically seeks additional information or clarification during this period of intense activity.

On July 6, 2020, eight days after the petition was filed, Commerce issued a questionnaire to Plaintiffs involving certain items in the calculation of the Bosnia dumping margin.  *See* Letter from Sec'y of Commerce to The Bristol Group PLLC, *Petition for the Imposition of Antidumping Duties on Imports of Silicon Metal from Bosnia and Herzegovina: Supplemental Questions* (Jul. 6, 2020) (PR 16).  Relevant to this litigation is the following request from Commerce:

> 9.  In Exhibit II-15, you provided financial ratio calculations using the financial statements of Elkem ASA (Elkem), which you identify as a Norwegian silicon metal producer on page 10.
>
>     a.  Please revise your calculation of the fixed overhead (FOH), selling, general and administrative (SG&A), and profit rates that were used to calculate the FOH, SG&A and profit components of COP using the financial statements of a Bosnian producer of merchandise identical or comparable to silicon metal.

      b.   Alternatively, if such statements are unavailable, please provide copies of GSM's 2019 financial statements and provide the calculations of the FOH, SG&A, and profit rates based on GSM's financial statements. Provide the COP and CV calculations based on those rates.

*See id*. at 4 (CR 12/PR 16).[4]

Plaintiffs responded to Commerce's supplemental questionnaire on July 8, 2020.  *See* Letter from The Bristol Group PLLC to the Sec'y of Commerce, *Silicon Metal from Bosnia and Herzegovina: Petition Supplement* (Jul. 8, 2020) (PR 19) ("Petition Supplement").  Plaintiffs answered question 9.a. as follows:

> As detailed in Volume I there are (or were) three known producers of identical merchandise Bosnia and Herzegovia: Bosnia-Herzegovina: (1) BSI d.o.o. ("BSI"), (2) R-S Silicon d.o.o. ("R-S Silicon"), and (3) Steelmin BH d.o.o. ("SteelminBH").  Petitioners conducted intensive open source research but were unable to obtain financial statements for any of these producers, or for Metalleghe spa, the Italian group that owns BSI and R-S Silcon.
>
> With regard to producers of comparable merchandise in Bosnia and Herzegovia, Petitioners sought to identify producers of potentially comparable merchandise such as ferrosilicon or silicon manganese with publicly-available financial statements. While Petitioners' research identified potential producers of comparable merchandise, *e.g.*, SteelminBH, financial statements for these producers were not publicly available.  Petitioners, therefore, are unable to revise the cost calculations to rely on the financial ratios for a Bosnian producer of identical or comparable merchandise.  As discussed below, Petitioners continue to rely on Elkem as the most accurate financial data available reasonably available for purposes of this petition.

*See id*. at 10-11 (citations omitted) (PR 19).

With regard to Commerce's request in 9.b., Plaintiffs further stated that:

---

[4] Plaintiffs have removed the brackets around GSM as this information was otherwise treated publicly in the underlying investigation.  Specific figures from the confidential financial data pertaining to GSM will continue to be bracketed.

GSM does not have stand-alone audited financial statements.  It is a subsidiary of Ferroglobe PLC and its financial information is audited only at the consolidated level.  Therefore the only audited financial statement available is Ferroglobe's FY 2019 consolidated financial included in Ferroglobe's 2019 Annual Report, which Petitioners provide at Exhibit Supp-II-5. As indicated at the consolidated income statement at pages 75 and 76, Ferroglobe had a loss for 2019.  In addition, the segment information at page 113 indicates the North American segment likewise had a loss for 2019. Petitioners also provide, at Exhibit Supp-II-6, the separate financial data for GSM that was used to compile the aggregated financial data submitted at Exhibit I-43 of Volume I. As detailed, [
    ].

It is the Department's very long-standing, established practice to not base financial ratios on the financial data for companies that have experienced losses.  Because ratios based on these financial data would distort the calculation of the costs of production and constructed value, it is neither accurate nor appropriate to rely on Ferroglobe's consolidated or GSM's separate financial information.  Because of this and in accordance with the Department's practice, Petitioners continue to rely on the financial data for the Norwegian producer Elkem ASA.  As discussed in Volume II, the main activity of Elkem ASA is the production and sales of silicon materials. While Elkem ASA is the parent company over a larger Elkem Group, its 2019 Annual Report includes the consolidated audited financials as well as Elkem ASA's stand-alone audited financials.  Ratios based on Elkem ASA's audited stand-alone financials are contemporaneous to the POI, reflect profits and capture the financial experience specific to the production of silicon metal. Accordingly, these financial data are the best evidence reasonably available to Petitioners and are an appropriate basis upon which to calculate the financial ratios specific to silicon metal production by the Bosnian producers.

*See id*. at 11-12 (CR 14/PR 19).  While Plaintiffs continued to rely on Elkem's financial statements, certain other revisions to the calculation, which are not at issue in this litigation, resulted in a revised Petition margin of 39.00 percent.

Commerce accepted these responses, raised no questions, issued no further questions or requests for clarification, and proceeded to initiate the underlying less-than-fair-value investigation on July 20, 2020.  *See Silicon Metal From Bosnia and Herzegovina, Iceland, and Malaysia:  Initiation of Less-Than-Fair-Value Investigations,* 85 Fed. Reg. 45,177 (Jul. 27,

2020) (PR 26) ("*Initiation Notice*").  As is standard, Commerce included an Initiation Checklist

as part of the initiation materials.  *See* Enforcement and Compliance, Office of AD/CVD

Operations, *Antidumping Duty Investigation Initiation Checklist:  Silicon Metal from Bosnia and

Herzegovina* (Jul. 20, 2020) (PR 24) ("Initiation Checklist").

In the Initiation Checklist, Commerce included a margin calculation in which it

unilaterally revised the CV normal value calculations to use Ferroglobe's consolidated financial

statements to calculate the financial ratios for OH, SG&A, and profit.  This resulted in a margin

of 21.41 percent.  *See id.* at 7-8 & Attachment V (PR 24).  The agency justified this approach

saying:

> *Based on Commerce's preference not to use financial statements from*
> *third countries to calculate CV ratios*, we recalculated the financial ratios
> using the consolidated 2019 financial statements provided by the
> petitioners.  Specifically, we based the remaining information on data
> derived from the 2019 consolidated financial statements of Ferroglobe
> PLC.

*See id*. (emphasis added) (PR 24).  Because Ferroglobe also is in a third country. however,

Commerce's rationale was based on an in incorrect premise.

During the investigation, Commerce selected one Bosnian producer, RSS, as the sole

"mandatory" respondent, *i.e.*, a company selected for individual examination.  *See* Memorandum

From Kelsie Hohenberger, International Trade Compliance Analyst, Office V, Through Shawn

Thompson, Director, Office V, To James Maeder, Deputy Assistant Secretary for Antidumping

and Countervailing Duty Operations, *Less-Than-Fair-Value Investigation of Silicon Metal from

Bosnia and Herzegovina: Respondent Selection* (Aug. 12, 2020) (PR 28).

After being selected for individual investigation, on September 30, 2020, RSS informed

Commerce that it did not intend to further participate in the investigation.  *See* Letter from

Faegre Drinker Biddle & Reath LLP to Sec'y of Commerce, *Antidumping Duty Investigation of*

*Silicon Metal from Bosnia and Herzegovina: R-S Silicon Intent Not to Respond* (Sep. 30, 2020)

(PR 44).

On October 6, 2020, given RSS's failure to respond, Plaintiffs argued that for the

preliminary determination, Commerce should apply an AFA rate of 39.00 percent calculated in

the Petition Supplement, rather than the 21.41 percent rate calculated in the Initiation Checklist,

in light of the calculation issues arising from reliance on the financial statement of a company

that incurred a loss.  *See* Letter from The Bristol Group PLLC to the Sec'y of Commerce, *Silicon

Metal from Bosnia and Herzegovina: Request for Application of Total Facts Available with

Adverse Inferences to R-S Silicon d.o.o* (Oct. 6, 2020) (PR 46).  Plaintiffs contended that:

> It is contrary to the Department's long-standing practice to use
> Ferroglobe's financial statements to calculate constructed value financial
> ratios, and consequently, the estimated dumping margin, in this
> investigation, because the Department has an established practice not to
> use financial data for companies that have experienced losses as the basis
> for financial ratios.  Because ratios based on these financial data distort the
> calculation of the costs of production and constructed value, it is neither
> accurate nor appropriate to rely on Ferroglobe's consolidated or [
>                          ] financial information to calculate the estimated dumping
> margin.  In accordance with the Department's practice, Petitioners
> respectfully request that the Department rely on the financial data of
> Elkem ASA, a Norwegian producer of identical merchandise, to calculate
> the estimated dumping margin for the final determination and use the
> resulting margin as the total AFA rate for R-S.  As discussed in Volume II
> of the Petitions, the main activity of Elkem ASA is the production and
> sales of silicon materials. While Elkem ASA is the parent company over a
> larger Elkem Group, its 2019 Annual Report includes the consolidated
> audited financials as well as Elkem ASA's stand-alone audited financials.
> Financial ratios based on Elkem ASA's audited stand-alone financials are
> contemporaneous to the POI, reflect profits and capture the financial
> experience specific to the production of silicon metal.  Accordingly, these
> financial data are the best information reasonably available on the record
> and are an appropriate basis upon which to calculate the financial ratios
> specific to silicon metal production by the Bosnian producers for the final
> determination.  Based on Elkem ASA's 2019 financial statements, the
> estimated dumping margin is 39.00 percent for silicon metal producers in
> Bosnia and Herzegovina.  Therefore, the Department should assign the
> AFA rate of 39.00 percent to R-S.

*See id.* at 3-4 (citations omitted) (PR 46).  Plaintiffs acknowledged the time pressure facing

Commerce during the initiation phase, but observed that in the many months between initiation

of the proceeding and the preliminary determination Commerce's investigation team had ample

time to review the record and fully correct its erroneous calculation approach.  *See id*. at 4-5 (PR

46).

Interestingly, although it completely stopped cooperating in the investigation, RSS

submitted comments arguing that Commerce should apply the 21.41 percent rate as AFA.  *See*

Letter from Faegre, Drinker, Biddle & Reath LLP to the Sec'y of Commerce*, Antidumping Duty*

*Investigation of Silicon Metal from Bosnia and Herzegovina: Reply to Petitioners' Request for*

*Application of Total Facts Available with Adverse Inferences* (Oct. 9, 2020) (PR 47).

In the *Preliminary Determination*, Commerce correctly determined that RSS had failed to

cooperate to the best of its ability in the investigation and assigned the company a preliminary

margin based on total AFA, pursuant to 19 U.S.C. § 1677e(b).  *See Silicon Metal From Bosnia*

*and Herzegovina and Iceland: Preliminary Affirmative Determination of Sales at Less Than Fair*

*Value*, 85 Fed. Reg. 80,009 (Dec. 11, 2020) (PR 69) ("*Preliminary Determination*").  As total

AFA, Commerce assigned RSS a rate of 21.41 percent *ad valorem*.  Commerce claimed,

incorrectly, that this rate was the only margin alleged in the Petition.  *See id*. at 80,010 (PR 69).

As noted above, however, the Petition (incorporating the changes as per the Petition Supplement)

alleged a margin of 39.00 percent *ad valorem*.

In the Preliminary Decision Memorandum accompanying the *Preliminary Results*,

Commerce supported its decision by stating:

> The petitioners requested that we assign an AFA rate of 39.00 percent, a
> rate the petitioners calculated in a supplement to the Petition using
> financial statements from a Norwegian silicon metal producer. *It is*

12

> *Commerce's long-standing practice not to rely on financial statements from third countries to calculate financial ratios; therefore, we initiated the investigation using financial ratios of Ferroglobe PLC, the parent company of petitioner Globe Specialty Metals, Inc.* In Petitioners' Bosnia AFA Request, the petitioners provided no new facts on the record for Commerce to consider. Therefore, we have preliminarily assigned the rate calculated in the *Initiation Notice* as the appropriate AFA rate.

*See* Memorandum From James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, To Jeffrey Kessler, Assistant Secretary for Enforcement and Compliance, *Decision Memorandum for the Preliminary Determinations in Less-Than-Fair Value Investigations of Silicon Metal from Bosnia and Herzegovina and Iceland* at 6, n.30 (Dec. 7, 2020) (PR 48) (emphasis added) ("Preliminary Decision Memorandum").

Because the *Preliminary Determination* was based entirely on AFA, the investigation then proceeded directly to briefing. Plaintiffs submitted a case brief arguing that Elkem's financial statements provide the best basis for calculating the surrogate financial ratios used to calculate the total AFA margin.

Specifically, Plaintiffs pointed out the major error in Commerce's claim that the Elkem financial statement was unusable because Elkem is located in a third country, when in fact Ferroglobe itself, the company Commerce used when it recalculated CV financial ratios in the initiation phase, *also* is located in a third country. *See* Letter from The Bristol Group PLLC to the Sec'y of Commerce*, Silicon Metal from Bosnia and Herzegovina: Case Brief and Request for Hearing* at 6-9 (Jan. 11, 2021) (PR 53).

Moreover, Plaintiffs reiterated that Ferroglobe suffered a loss during the fiscal year in question, which alone would normally be grounds for Commerce to reject using its financial statements in its calculations. *See id*. at 4-6 (PR 53). Plaintiffs also reiterated that Ferroglobe's operations encompass a range of activities unrelated to the production and sale of the subject

13

merchandise (or even comparable merchandise), such as hydroelectric power production, timber farming, and coal mining. *See id*. at 7 (PR 53). Lastly, Plaintiffs also pointed out that Commerce's repeatedly described practice is to apply the highest margin alleged in a petition as AFA. *See id*. at 2-4 (PR 53).

For its part, RSS again popped up, submitting a rebuttal brief in which it argued for Commerce to continue to apply the 21.41 percent rate as AFA. *See* Letter from Faegre, Drinker, Biddle & Reath LLP to the Sec'y of Commerce*, Antidumping Duty Investigation of Silicon Metal from Bosnia and Herzegovina: Rebuttal Brief of R-S Silicon d.o.o.* (Jan. 19, 2021) (PR 55).

In the *Final Determination*, Commerce rejected Plaintiffs' arguments and analysis and continued to assign the 21.41 percent *ad valorem* margin as the total AFA rate for RSS. *See Final Determination*, 86 Fed. Reg. at 11,721 (PR 70). In the accompanying Issues and Decision Memorandum, Commerce disputed Plaintiffs' characterization of its practice regarding the application of AFA rates and attempted to support its continued reliance on Ferroglobe's financial statements to calculate the ratios for OH, SG&A, and profit. *See* Issues and Decision Memorandum at 2-11 (Feb. 22, 2021) (PR 61) ("Issues and Decision Memorandum"). Commerce's flawed reasoning, and Plaintiff's responses thereto, are discussed below.

This appeal followed.

**ARGUMENT**

## I.   LEGAL FRAMEWORK

### A.   Application of Facts Available with Adverse Inferences When a Respondent Withdraws from a Proceeding

There is no dispute about the propriety of Commerce's resort to total facts available with inferences adverse to the interests of RSS based on RSS's decision to stop cooperating in the

14

investigation.  The statute, 19 U.S.C. § 1677e(b), states that Commerce, when employing an adverse inference, may rely upon information derived from the petition, the final determination from the less-than-fair-value investigation, a previous administrative review, or any other information placed on the record.  *See* 19 C.F.R. § 351.308(c).

In selecting a rate based on AFA, Commerce selects a rate that is sufficiently adverse to ensure that the uncooperative party does not obtain a more favorable result by failing to cooperate than if it had fully cooperated.  *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994) ("SAA") at 870.

Commerce's practice is to select, as an AFA rate, the higher of:  (1) the highest dumping margin alleged in the petition, or (2) the highest calculated rate of any respondent in the investigation.  *See*, *e.g.*, *Welded Stainless Pressure Pipe from Thailand: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 31,093 (May 30, 2014), and accompanying Issues and Decision Memorandum at Comment 3.  Indeed, this is the precise approach Commerce itself described in the underlying investigation, but which it did not follow.  *See* Preliminary Decision Memorandum at 6 (PR 48).

In the underlying investigation, as noted above, RSS was the sole mandatory respondent, and it elected not to cooperate in this investigation.  Because of this, there were no calculated margins (*i.e.*, calculated using a respondent's actual data) in the proceeding.  Thus, Commerce, following its practice, should have followed the first option described above, as that was the only option available.[5]  Instead, Commerce unilaterally recalculated the CV-based NV in the Initiation

---

[5] As has been previously stated, the margin initially alleged in the Petition was 62.65 percent.  Plaintiffs are not arguing that that margin should be applied.  Ostensibly, a more accurate description of Commerce's practice would be that it relies on the highest margin in a petition, including subsequent corrections reflected in any supplements thereto, as is the case here, and which produced a margin of 39.00 percent.

Checklist, using the consolidated financial statements of Ferroglobe, which, like Elkem is also located in a third country, but unlike Elkem, experienced a loss for the fiscal year in question, and whose financial experience reflects a range of economic activities unrelated to the production and sale of identical or even comparable merchandise.

Commerce then sought to confirm that this margin had probative value, by corroborating it in accordance with 19 U.S.C. § 1677e(c).  This statutory provision provides that, where Commerce relies on secondary information (such as in the petition) rather than information obtained in the course of an investigation, it must corroborate, to the extent practicable, information from independent sources that are reasonably at its disposal.  Secondary information is defined as information derived from the petition that gave rise to the investigation, the final determination concerning the subject merchandise, or any previous review under section 751 of the Tariff Act of 1930, as amended, concerning the subject merchandise.  *See* SAA at 870.  The SAA clarifies that "corroborate" means that Commerce will satisfy itself that the secondary information to be used has probative value.  *See id.*; *see also* 19 C.F.R. § 351.308(d).

To corroborate secondary information, Commerce will, to the extent practicable, examine the reliability and relevance of the information to be used.  19 U.S.C. § 1677e(c)(1).  Pursuant to 19 U.S.C. § 1677e(d)(3), Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated, or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.  *See* 19 U.S.C. § 1677e(d)(3); Preliminary Decision Memorandum at 7 (PR 48).  Just as Commerce corroborated the 21.41 percent rate, it could just as easily do so for the 39.00 percent rate.  Indeed, doing so would be more straightforward given the superiority of the Elkem financial statements as the basis for the CV financial ratios.

### B.  Calculating Normal Value Using Constructed Value

The 21.41 percent margin assigned to the Bosnian respondent, as well as the 39.00

percent margin calculated in the Petition supplement, were both calculated using normal value

based on constructed value because no prices for silicon metal in Bosnia, or for sales of Bosnian

silicon metal in a third country, were available.  In this case, the statutory guidelines for

calculating normal value based on constructed value states that constructed value will be an

amount equal to the sum of:

> (1)    the cost of materials and fabrication or other processing of any
> kind employed in producing the merchandise, during a period
> which would ordinarily permit the production of the merchandise
> in the ordinary course of trade;
>
> (2)(A) the actual amounts incurred and realized by the specific exporter or
> producer being examined in the investigation or review for selling,
> general, and administrative expenses, and for profits, in connection
> with the production and sale of a foreign like product, in the
> ordinary course of trade, for consumption in the foreign country. . .

19 U.S.C. § 1677b(e).

The statute recognizes that the actual amounts – that is, from the foreign producer – may

not be available.  In such cases, the statute describes several alternative sources of the data that

may be used to calculate normal value:

> (2)(B)  if actual data are not available with respect to the amounts
> described in subparagraph (A), then—
>
> (i)    the actual amounts incurred and realized by the specific exporter
> or producer being examined in the investigation or review for
> selling, general, and administrative expenses, and for profits, in
> connection with the production and sale, for consumption in the
> foreign country, of merchandise that is in the same general
> category of products as the subject merchandise,
>
> (ii)   the weighted average of the actual amounts incurred and realized
> by exporters or producers that are subject to the investigation or
> review (other than the exporter or producer described in clause
> (i)) for selling, general, and administrative expenses, and for
> profits, in connection with the production and sale of a foreign

17

like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii)    the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise . . .

19 U.S.C. § 1677b(e)(2)(B).  When using "any other reasonable method" pursuant to subsection (iii), which was the basis for the CV normal value calculation in the Petition, the data selected are subject to a cap on the amount of profit that will be included – which inherently assumes that the agency will rely on a source that does not have zero profit or a loss.

### C. Petitioner's Evidentiary Burden When Filing a Petition

Given the requirements that must be satisfied to initiate an investigation, petitioners follow these statutory requirements, to the best of their ability, when developing margins of estimated dumping for purposes of a petition.  Recognizing that a petitioner will not have access to a respondent's data, or to the data that would be developed on the record during the course of an investigation, the statute requires a petition to be based on "information reasonably available to the petitioner supporting the allegations in the Petition", *i.e.*, including the margin calculations.  19 U.S.C. § 1673a(c)(1)(A)(i).

Thus, in preparing the Petition, Plaintiffs used information "reasonably available" to them for the purpose of preparing a constructed value-based normal value buildup that met the statutory requirements and Commerce's policies and practices.  With respect to financial data for the CV calculation, they first sought to obtain data from the foreign producers (and their Italian parent), but those were not available.  They then looked to a producer in a third country outside of Bosnia, as Commerce is authorized to do, and identified Elkem.  Petitioners obviously were

18

aware that Ferroglobe produced silicon metal, but recognized that Ferroglobe's financial

statements were unusable because they both showed a loss for the fiscal year, and because they

reflected a range of business activities unrelated to the production and sale of subject

merchandise.

## II.     USING FERROGLOBE'S FINANCIAL STATEMENTS TO CALCULATE THE FINANCIAL RATIOS WHEN CALCULATING NORMAL VALUE BASED ON CONSTRUCTED VALUE IS NEITHER SUPPORTED BY SUBSTANTIAL EVIDENCE NOR ADEQUATELY EXPLAINED

### A.     Elkem's Financial Statements Represent a Superior Source for Calculating the Financial Ratios Used in the CV-Based NV Buildup

#### 1.     Both Elkem and Ferroglobe Are Third Country Sources

Plaintiff acknowledge Commerce's preference, all things being equal, to base constructed

value financial ratios on a home-market source, which was not available in the underlying

investigation.  Commerce, however, did not do so even once it rejected Elkem.  Ferroglobe is not

based in Bosnia and Herzegovina; it is headquartered in London, England, with operations in

Spain, South Africa, France, Canada, and the United States.  *See* Petition Supplement at Exhibit

SUPP-II-5, at 5-6, 8, 11 (PR 19).  In the Issues and Decision Memorandum accompanying the

*Final Determination*, Commerce offered a single paragraph with questionable analysis as to why

it did not consider Ferroglobe to be a third-country source:

> Although the petitioners allege that Ferroglobe's financial statements are
> those of a third-country producer, we disagree. While Ferroglobe may be
> headquartered in a third country and have operations in multiple countries,
> it is the parent company of a petitioner which is a U.S. producer of silicon
> metal. The petitioners stated that all silicon metal producers use essentially
> the same inputs and production process. Therefore, the petitioners
> calculated the cost of production based on their own experience. As we are
> applying usage rates from a petitioner's own experience, for petition
> initiation purposes, we also find it appropriate to base the CV ratios on
> that petitioner's parent company. This way, the usage rates and CV ratios
> have a link to the same source.  Although the parent company is
> headquartered abroad, its financial statements include the data from the

> petitioner itself, making Ferroglobe's financial statements, at least in part,
> reflective of the financial data of that U.S. producer. Conversely, as a
> Norwegian silicon metal producer, Elkem's financial statements represent
> entirely third-country based data with no element of cost from either the
> country under investigation or a U.S. producer. Therefore, consistent with
> the Initiation Checklist and *Preliminary Determination,* we have
> continued to not rely on the third-country financial statements.

*See* Issues and Decision Memorandum at 9 (citations omitted) (PR 61).  As a fallback position,

Commerce attempted to justify its use of Ferroglobe's data by claiming that doing so "links" the

material usage rates used in the petition to the parent company of the relevant petitioner (GSM).

With all due respect, this explanation strains credulity and is not supported by the record.  In the

quoted paragraph, Commerce admits that Ferroglobe is based in a third country, the very reason

why it rejected Elkem.  Moreover, on a revenue basis, GSM represented only [     ] percent of

Ferroglobe's consolidated operations for 2019.  *See* Petition Supplement at Exhibit SUPP-II-6

(CR 14/PR 19); Initiation Checklist at Attachment V – Part I (CR 18/PR 24).

 At bottom, then, Commerce's rationale is spurious.  Elkem and Ferroglobe clearly both

represent third-country sources and are equivalent in this respect, and as will be demonstrated

below, Elkem's financial statements are far superior in other respects.

 Moreover, although historically Commerce may have had a preference to rely on home

market sources rather than third country sources, in recent years Commerce has relied multiple

times – with the approval of reviewing courts – on third country sources to calculate CV ratios

when home market sources are deficient or unavailable.

 For example, in investigations of oil country tubular goods ("OCTG") from Korea and

Turkey, Commerce relied on third country sources of data from producers of identical

merchandise, when there were no home market producers of merchandise that was in the same

general category as subject merchandise.  *See Certain Oil Country Tubular Goods From the*

*Republic of Korea: Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances*, 79 Fed. Reg. 41,983 (July 18, 2014) ("*OCTG from Korea*") and accompanying Issues and Decision Memorandum at Comment 1; *Certain Oil Country Tubular Goods From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances, in Part*, 79 Fed. Reg. 41,971 (July 18, 2014) ("*OCTG from Turkey*") and accompanying Issues and Decision Memorandum at Comment 3.

Similarly, in multiple segments of the certain steel nails from Oman antidumping proceeding, Commerce has relied on third country sources of CV data from a producer of identical or comparable merchandise, when there were no home market producers of merchandise that was in the same general category as subject merchandise. *See Certain Steel Nails From the Sultanate of Oman: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 28, 972 (May 20, 2015) and accompanying Issues and Decision Memorandum at 13-14; *see also Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2014-2016*, 83 Fed. Reg. 4,030 (Jan. 29, 2018) and accompanying Issues and Decision Memorandum at Comment 2; *Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 58,231 (Nov. 19, 2018) and accompanying Issues and Decision Memorandum at Comment 6; *Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 84 Fed. Reg. 71,372 (Dec. 27, 2019) and accompanying Issues and Decision Memorandum at Comment 1.

As noted above, Commerce's practice in this regard has been upheld by the courts. *See, e.g.*, *Mid Continent Steel & Wire, Inc. v. United States*, 273 F. Supp. 3d 1348, 1351-1353 (Ct.

Int'l Trade 2017), *aff'd in part*, 941 F.3d 530, 542-543 (Fed. Cir. 2019); *Husteel Co., Ltd. v. United States*, 180 F. Supp. 3d 1330, 1343-1346 (Ct. Int'l Trade 2016), *aff'd*, 710 Fed. Appx. 890 (Fed. Cir. 2018).

As the administrative and judicial precedents make clear, when the record does not contain any suitable home market sources of data (either because there are no home market producers of merchandise in the same general category as the subject merchandise, or because other potential financial statements on the record show a loss as is the case here), Commerce reasonably relies on data from third-country producers of merchandise in the same general category to calculate CV profit (as well as other financial ratios) as the best information available on the record.  Indeed, the legislative history recognizes Commerce's need for flexibility when considering profit data sources under 19 U.S.C. § 1677b(e)(2)(B)(iii).  As the SAA states, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data."  *See* SAA at 840.  In particular, when considering alternative (iii), the SAA notes that "the Administration does not believe that it is appropriate at this time to establish particular methods and benchmarks for applying this alternative."  *See id*. at 840-841.  In sum, Elkem's financial statements are a completely viable source for calculation the CV financial ratios, and as detailed below, are superior to Ferroglobe's in important respects.

2. **Elkem's Business Activities Better Reflect the Financial Experience of a Company Dedicated to the Production of Identical and Comparable Merchandise**

As discussed in Volume II of the Petition*,* Elkem's main activity is the production and sale of silicon materials.  Indeed, the standalone financial statement indicates that "{t}he main activities are related to the production and sale of silicon materials, ferrosilicon, specialty alloys

for the foundry industry and microsilica."[6]  *See* Petition at Volume II, Exhibit II-24 (PR 7-11).

While Elkem Group is the parent company over Elkem, its 2019 Annual Report includes

Elkem's stand-alone audited financials.  *See Petition* at Volume II, 10-11 & Exhibit II-24 (PR 1-

11).  Financial ratios based on Elkem's audited stand-alone financials are contemporaneous to

the POI, reflect profits, and capture the financial experience specific to the production of silicon

metal.  These financial data are the best information reasonably available on the record for

purposes of calculating the Petition margin, and as such the margin to be used as total AFA.  As

Commerce itself acknowledged, "{t}he petitioners stated that all silicon metal producers use

essentially the same inputs and production process."  *See* Issues and Decision Memorandum at 9

(PR 61).  Thus, even though it is located in a third country, Elkem's financial data would be a

very close match to a Bosnian producer's (or for that matter, a U.S. producer's) experience given

the similarity in the production process, capital structure, customer base, *etc.*  Indeed,

Commerce's statement would seem to obviate any concern about using a third country data

source.  In marked contrast, Ferroglobe's broad range of business includes timber farms,

manganese-based alloy production, quartz and coal mining, and hydroelectric power activities

(*i.e.*, highly non-comparable merchandise), among other things.  *See* Petition Supplement at

Exhibit SUPP-II-5, at pages 8, 11 (PR  19).  Given this, the evidence begs the question of which

of the above two companies' financial data would be the only reasonable choice that reflects a

"link" to the production and sale of the subject merchandise?

---

[6] Microsilica is a by-product of the silicon metal production process.

**3.      Elkem Was Profitable During the Applicable Fiscal Year, Whereas Ferroglobe Was Not, and, When Available, Commerce Has a Clear Preference for Basing Financial Ratios on Companies That Are Profitable**

Commerce's reliance on a margin drawn from the Initiation Checklist is methodologically unsound and contrary to the record evidence.  Over Petitioners' respectful objections, the 21.41 percent dumping margin in the Initiation Checklist was calculated using financial ratios obtained from the 2019 consolidated financial statements of Ferroglobe.  *See* Initiation Checklist at 7-8 (PR 24).  Ferroglobe's 2019 consolidated financial statements, however, show that it incurred a <u>loss</u> in 2019.  *See* Petition Supplement at 11 & Exhibit Supp-II-5 (PR 19).  In addition, the segment information in its financial statements indicates that the North American segment as a whole also had a loss for 2019.  *See id.* at Exhibit Supp-II-5, at page 113 (PR 19).  Petitioners also provided separate financial data for GSM, a subsidiary of Ferroglobe, which were used to compile the aggregated financial data forming the basis of Ferroglobe's audited consolidated financial statements.  *See id.* at Exhibit Supp-II-6 (CR 14/PR 19).  Reflecting the very injury that gave rise to this proceeding, [

].  *See id.* (CR 14/PR 19).

It is contrary to Commerce's long-standing practice to use Ferroglobe's financial statements to calculate the CV financial ratios, and consequently, an estimated dumping margin for AFA purposes, in this investigation.  Commerce has an established practice <u>not</u> to use financial data from companies that have experienced losses as the basis for financial ratios.  *See, e.g.*, *Catfish Farmers of Am. v. United States*, 36 CIT 1441, 1454 (Ct. Int'l Trade 2014) (not reported in F. Supp. 3d), *aff'd*, 645 F. App'x 1001 (Fed. Cir. 2016); *Catfish Farmers of America v. United States*, 641 F.Supp.2d 1362, 1378 (2009); *Notice of Final Determination of Sales at Less Than Fair Value and Termination of Critical Circumstances Investigation: Electrolytic*

*Manganese Dioxide from Australia*, 73 Fed. Reg. 47,586 (Aug. 14, 2008) and accompanying

Issues and Decision Memorandum at 6 ("it is the Department's practice not to rely on companies

with zero-profit rates when calculating CV profit") ("*EMD from Australia*") (citing *Notice of*

*Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol From the Republic of*

*Korea*, 68 Fed. Reg. 47,540 (Aug. 11, 2003), and accompanying Issues and Decision

Memorandum at Comment 1) ("*PVA from Korea*")).

    While Commerce takes issue with the age of *EMD from Australia* and *PVA from Korea*

(*see* Final IDM at 7), its practice of not using zero-profit financial statements to calculate the CV

financial ratios has clearly continued since then.  Moreover, both of those cases are distinct from

the underlying investigation here, in that Commerce recalculated the initiation rates using

information submitted later in those investigations.  In contrast, the use of later-submitted

information is not being contemplated here, so Commerce's position as expressed in the Final

IDM is not persuasive.

    Indeed, both *EMD from Australia* and *PVA from Korea* support a determination not to

rely on a company with zero profit when calculating the total AFA margin assigned to RSS.  In

*EMD from Australia*, the CV-based petition margin was calculated using a profit rate of zero,

because the petitioner submitted only one financial statement from a company that was not

profitable with its petition.  As RSS did in the underlying investigation, an uncooperative

respondent argued that Commerce should use that petition margin as the total AFA rate.

Commerce declined, stating:

> We disagree with Delta's contention that we should use a profit rate of
> zero because the record indicates that it had no profits during the POI. As
> we stated in our Australia Initiation Checklist at the commencement of
> this investigation (September 11, 2007), the margin on which we initiated
> this investigation, based on a comparison of CV to U.S. price, did not
> include an amount for profit because the only financial statement

submitted by the petitioner in the original petition reflecting the experience of Delta PLC (Delta's parent company) showed a net loss for the manganese segment for the year ending 2006. We stated that we would examine different options for calculating a profit rate later in this proceeding if it became necessary to calculate a CV from the petition. *See* Australia Initiation Checklist at 9. Thus, consistent with our practice, our intent was to include a positive profit rate should we use the petition rate as facts available or AFA in the course of this proceeding.

*See EMD from Australia* and accompanying Issues and Decision Memorandum at 6.

Commerce went on to explain that:

Because Delta is an uncooperative respondent in this investigation, the Department is not relying on the unverified information submitted by Delta in the course of this proceeding. Use of a zero-profit rate would not be adverse but rather would benefit Delta for its non-cooperation. Moreover, it is the Department's practice not to rely on companies with zero-profit rates when calculating CV profit.

*See id*.

In *EMD from Australia*, Commerce recognized that an AFA rate incorporating the financial experience of a zero-profit company would be inappropriate and took corrective action. In the underlying investigation here, Commerce did the exact opposite, unilaterally recalculated the amended Petition margin using a zero-profit company, and then applied it as the AFA rate to an uncooperative respondent.

In *PVA from Korea*, Commerce stated that:

For purposes of the AFA margin, we agree with the petitioners that DC CHEM should not receive the benefit of a profit rate of zero because it has not cooperated to the best of its ability in this investigation. Therefore, we have considered alternate sources for profit, including data derived from other "surrogate" companies. The margin as alleged in the petition was based on CV. In the initiation notice, the Department relied conservatively on a profit rate of zero, indicating that it would revisit the rate should it be relied upon for the final determination.

*See PVA from Korea* and accompanying Issues and Decision Memorandum at 3.

Commerce went to revise the AFA margin calculation using a profit rate based on the

financial data of LG Petrochemicals. *See id*. at 4.

Because ratios based on financial data such as Ferroglobe's distort the calculation of

normal value, it is neither accurate nor appropriate – or reasonable – to rely on Ferroglobe's

consolidated financial information for an AFA margin. Indeed, the SAA recognizes this, stating

that "in most cases Commerce would use profitable sales as the basis for calculating profit for

purposes of constructed value." *See* SAA at 840. Moreover, to the extent that Commerce is

concerned about having to gather new information to update petition margins, no such updating

is necessary here because the information pertaining to a profitable company for CV purposes

has been on the record since the initiation phase.

Commerce provided no explanation for its decision to vary from its established practice

of not using data from a company that incurred losses. Instead, citing *Certain Steel Grating from

the People's Republic of China: Final Determination of Sales at Less than Fair Value*,

75 Fed. Reg. 32,366 (Jun. 8, 2010) ("*Steel Grating from China*"), and accompanying IDM at

Comment 2, Commerce defensively claimed that they will not revisit initiation margins. Final

IDM at 7-8 (PR 61).

This merely sidesteps the issue of Commerce's failure to either follow its longstanding

practice of not relying on company with no profit or with losses, or to provide any kind of

reasoned explanation for its failure to do so below. Moreover, as a technical matter, in the

underlying investigation, Commerce would not need to revisit the initiation margin, *i.e.*, gather

additional information and perform new calculations, because all of the necessary information

and calculations were on the record since the initiation phase, and as discussed below, the only

part of the calculation Commerce changed in the Initiation Checklist was the source of the

financial ratios.  Commerce cannot now claim that the calculations yielding the 39.00 percent

margin are flawed, when the agency itself relied on them apart from replacing Elkem with

Ferroglobe.

> ### 4.      Commerce's Explanations for Not Using the Highest Margin from the Petition Are Unavailing and Contrary to Its Practice

In the Issues and Decision Memorandum, Commerce mischaracterizes Plaintiffs'

arguments below:

> As an initial matter, we disagree with the petitioners' assertion that
> Commerce is required to select the highest dumping margin alleged in the
> petition when selecting an AFA rate, simply because a petitioner includes
> it there. The margins upon which Commerce relies when initiating an
> LTFV investigation must be accurate to the extent practicable and
> consistent with Commerce's established policies and regulations.
> Commerce regularly instructs petitioners to revise their margin
> calculations or, when necessary, Commerce itself revises petition margins
> at the time of initiation for methodological reasons or to correct
> mathematical errors.  We do not accept the contention that Commerce is
> required by law to use a mathematically erroneous, or otherwise flawed,
> margin simply because it was the number which appeared in the petition.
> Commerce has corrected such errors, including in recent investigations.
> Similarly, Commerce must be able to correct any discrepancies between
> Commerce's policy, practice, and/or regulations and the approach to a
> proposed margin calculation appearing in a petition. When a margin has
> been corrected or adjusted for initiation purposes, it would be illogical to
> conclude that Commerce is required to assign the uncorrected/unadjusted
> margin as an AFA rate subsequently during the proceeding.

See Issues and Decision Memorandum at 6 (PR 61).  As discussed above, Plaintiffs do not

contend that Commerce should use a mathematically erroneous margin.  Indeed, the 39.00

percent margin is based on a revised calculation from Plaintiffs' Petition Supplement that was

prepared in response to Commerce's questionnaire.  It is worth noting that when Commerce

replaced the Elkem data with Ferroglobe data, it made no other changes to the margin calculation

– in other words, Commerce itself understood that the calculation was sound.  Additionally, as

shown above, Commerce's decision to discard Elkem's financial statements in favor of Ferroglobe's had nothing to do with correcting any error, but rather with flawed reasoning to use a demonstrably inferior third-country data source over a superior one.  Thus, Commerce's reasoning on this point misses the mark.

Similarly, *Steel Grating from China*, the 11-year-old case Commerce relied on to support its position, actually supports using the revised Petition margin of 39.00 percent. As Commerce itself noted, "{i}n *Steel Grating from China*, Commerce stated that it saw 'no reason to vary from its standard practice of using initiation rates (*i.e.*, the revised rates from the petition as specifically revised at the Department's request) as the rates for applying adverse facts available.'"  *See* Issues and Decision Memorandum at 7-8 (PR 61).

Commerce then cites two additional cases for the proposition that it does not reconsider initiation margins.  In *Steel Wheels from China*, Commerce declined to evaluate whether an initiation rate was insufficiently adverse for a non-cooperating respondent and, therefore, did not recalculate an otherwise sound initiation margin that incorporated the financial ratios of a profitable company to yield a revised, higher AFA rate using surrogate value data submitted later in the investigation.  *See Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 Fed. Reg. 32,707 (Jul. 9, 2019) (*Steel Wheels from China*), and accompanying IDM at Comment 1.  Unlike the instant appeal, the initiation margin in *Steel Wheels from China* did not involve an erroneous calculation based on

an unexplained and unsupportable departure from sound Commerce practice.[7]  Moreover, this appeal is further distinguishable from *Steel Wheels from China* because Plaintiffs are not arguing for the use of later-developed information, merely that Commerce follow its long-established practice and the statutory guidelines underpinning it.

In *Aluminum Wire and Cable from China*, Commerce also declined to revisit the initiation margin using new information developed later during the course of the investigation. *See Aluminum Wire and Cable from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 58,134 (Oct. 30, 2019) (*Aluminum Wire and Cable from China*), and accompanying IDM at Comment 1.  This case is plainly inapposite, as Plaintiffs are not requesting that Commerce update an initiation margin using information obtained *later* in the investigation process.  All of the information at issue, and indeed the calculations and results, have been on the record and available for Commerce's consideration since the first weeks of the underlying investigation.

Commerce then states that "{t}he above methodology is also consistent with our corroboration practice generally, whereby, if Commerce is unable to corroborate a petition margin, we do not use that margin, nor do we adjust it.  Instead, we rely on an alternative source of AFA."  *See* Issues and Decision Memorandum at 8 (PR 61).  However, as applied to the underlying investigation, this puts the cart before the horse.  Commerce never even attempted to corroborate the revised margin of 39.00 percent from the Petition Supplement.  Moreover, that

---

[7] As a separate matter, the record supports the reasonable inference that the 21.41 percent rate applied as AFA is not sufficiently adverse to RSS, given that RSS, despite dropping out of Commerce's investigation altogether, continued to argue for that rate to be used as the AFA rate. Arguably, if RSS had decided to forego the U.S. market altogether, as its decision not to participate in the investigation would seem to indicate, then there would be little reason for the company to invest the time and money in arguing for one rate over another.

39.00 percent margin specifically incorporated adjustments that Commerce requested, and as noted above, Commerce made no changes to that calculation other than replacing Elkem's data with those of Ferroglobe.  Instead, Commerce unilaterally, and as detailed above, erroneously, used an inferior source for the CV financial ratios simply for the reason that it could "check a box" in its Initiation Checklist to say that it was using a source purportedly "linked" to other information used in the CV buildup.  This flawed decision resulted in the assigned AFA margin of 21.41 percent.  Clearly, Commerce's decision to do so is not supported, and is in fact contradicted by, its practice and record evidence.

**CONCLUSION**

In the underlying investigation Commerce doubled-down on the initiation team's erroneous decision to use a source of CV data from Ferroglobe, a company that incurred a loss and produces a broad range of non-comparable merchandise, unlike Elkem.  Commerce's subsequent attempts to justify or explain its choice – whether in the Initiation Checklist, the Preliminary Determination, or the Final Determination – avoid, minimize, or even misconstrue the substantial evidence showing that Elkem's financial statements are the best source for calculating the CV financial ratios.  Simply put, the institutional instinct to defend any position it takes, even if it is wrong, should not trump correct administrative practice.

This is not a situation in which the record, reasonably and fairly construed, supports two different determinations.  *See Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).  Using the financial statement from a company that suffered a loss, and whose data reflect activities nearly all fundamentally different from production of the subject merchandise, cannot be deemed reasonable at any level – not in light of Commerce's practice, and not when the record has

31

included the correct source of information from the very first day the underlying case began.

Consider the summary table below comparing the potential sources for the CV financial ratios:

| Criteria for Consideration | Elkem | Ferroglobe |
|---|---|---|
| Is the company located in the subject country or, failing that, in the country from which other information used in the CV buildup was sourced? | **No** | **No** |
| Is the company's financial experience representative of a producer/exporter of identical or comparable merchandise | **Yes** | **No** |
| Was the company profitable during the fiscal year? | **Yes** | **No** |

By any measure, the record evidence, when fully and objectively considered, clearly points to Elkem as the superior basis for the financial ratios. In light of its clear and reasonable practice of rejecting data sources showing losses, it is entirely unclear how Commerce can justify rejecting one third-country source of data from a profitable producer of identical merchandise in favor of another third-country source of data from a producer of identical merchandise and other non-comparable merchandise that experienced losses. This simply makes no sense; more to the point, it is unreasonable on its face and unsupported on the record by any meaningful evidentiary differences.

Furthermore, Commerce could easily corroborate a margin that reflected the use of Elkem's financial statements as the basis for the CV financial ratios. Commerce should find that this margin is corroborated by evidence supporting the calculations in the Petitions and determine that the 39.00 percent margin has probative value based on record evidence, pursuant to 19 U.S.C. § 1677e(c), 19 C.F.R. § 351.308(d), and SAA at 870. This is similar to cases in which Commerce recalculated an AFA rate on remand following judicial appeal and provided corroboration of the new AFA rate based on record evidence. *See*, *e.g.*, *BMW of North America*

32

*LLC v. United States*, 437 F. Supp. 3d 1336, 1344-1347 (Ct. Int'l Trade 2020); *POSCO v. United States*, 378 F. Supp. 3d 1348, 1354 (Ct. Int'l Trade 2019).

Moreover, because this investigation involved a non-cooperative respondent, Commerce has a duty to assign an AFA rate that will be sufficiently adverse in order to induce future cooperation. As discussed above, it is quite telling that RSS, despite its decision to stop participating in the investigation, nonetheless argued vociferously in favor of the 21.41 percent AFA rate.

For the reasons discussed above, Plaintiffs respectfully submit that this Court should reverse Commerce's determination to use Ferroglobe's financial statements for calculating the financial ratios used in the CV-based NV buildup and find that Commerce should instead use Elkem's financial statements because they best satisfy the criteria Commerce typically considers. Using Elkem's financial statements as the basis for the CV financial ratios results in a margin of 39.00 percent, and the Court should instruct Commerce to assign this as the AFA rate for RSS.

Respectfully submitted,

*/s/ Adam H. Gordon*
Adam H. Gordon
Jennifer M. Smith
Ping Gong
Lauren Fraid
**THE BRISTOL GROUP PLLC**
*Counsel to Globe Specialty Metals, Inc. and*
*Mississippi Silicon LLC.*

Dated: October 5, 2021

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff's Brief in Support of Rule 56.2 Motion for Judgment Upon the Agency Record, as computed by The Bristol Group PLLC's word processing system Microsoft Word for Microsoft 365, is 10,194 words, less than the 14,000 word limit.

<u>/s/ Adam H. Gordon</u>
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Mid Continent Steel & Wire, Inc.*

Dated:  October 5, 2021