### UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE

|  |  |  |
|---|---|---|
| **GLOBE SPECIALTY METALS, INC. and MISSISSIPPI SILICON LLC,** | ) ) ) | **Court No. 21-00231** |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| **UNITED STATES,** | ) ) | |
| *Defendant*. | ) ) ) | |

### DEFENDANT'S RESPONSE TO PLAINTIFFS' <u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

COUNSEL:

W. Mitch Purdy
Attorney
Office of the Chief Counsel
  for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

Dated December 20, 2021

BRET R. VALLACHER
Trial Attorney
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 616-0465

*Attorneys for Defendant*

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE**: **THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE**

|  |  |
|---|---|
| **GLOBE SPECIALTY METALS, INC. and MISSISSIPPI SILICON LLC,** | ) ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) ) ) |
| **UNITED STATES,** | ) ) ) |
| *Defendant*. | ) ) ) |

**Court No. 21-00231**

## <u>ORDER</u>

Upon consideration of the motion for judgment upon the agency record filed by plaintiffs, defendant's response thereto, plaintiffs' reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is DENIED; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____          _____
                                                              SENIOR JUDGE

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2(c)(1) .......................................................................... 1

   I.   Administrative Determination Under Review .................................................................... 1

   II.  Issue Presented For Review ............................................................................................... 2

STATEMENT OF FACTS ............................................................................................................. 2

   I.   The Petition And The Initiation Of The Investigation ..................................................... 2

   II.  The Preliminary Determination ........................................................................................ 4

   III. The Final Determination ................................................................................................... 5

SUMMARY OF THE ARGUMENT ............................................................................................. 6

ARGUMENT .................................................................................................................................. 6

   I.   Standard Of Review ......................................................................................................... 6

   II.  Commerce's Decision To Use Ferroglobe's Financial Statements Is Supported By
       Substantial Evidence And In Accordance With Law ....................................................... 8

CONCLUSION ............................................................................................................................. 21

## TABLE OF AUTHORIES

**Cases**                                                                                     **Page(s)**

*Catfish Farmers of Am. v. United States*,
 641 F.Supp.2d 1362 (Ct. Int'l Trade 2009) ............................................................ 13

*Cleo Inc. v. United States*,
 501 F.3d 1291 (Fed. Cir. 2007) ......................................................................... 7

*Dongtai Peak Honey Indus. v. United States*,
 777 F.3d 1343 (Fed. Cir. 2015) ......................................................................... 7

*FPC v. Transcon. Gas Pipe Line Corp.*,
 423 U.S. 326 (1976) ........................................................................................ 7

*Fujitsu Gen. Ltd. v. United States*,
 88 F.3d 1034 (Fed. Cir. 1996) ...................................................................... 7, 8

*Goldlink Indus. Co. v. United States*,
 431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ...................................................... 7

*Husteel Co., Ltd. v. United States*,
 180 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) .................................................... 15

*Mid Continent Steel & Wire, Inc. v. United States*,
 273 F. Supp. 3d 1348 (Ct. Int'l Trade 2017) .................................................... 15

*Mid Continent Steel & Wire, Inc. v. United States*,
 941 F.3d 530 (Fed. Cir. 2019) ....................................................................... 15

*Nippon Steel Corp. v. United States*,
 337 F.3d 1373 (Fed. Circ. 2003) .................................................................... 21

*PAM, S.p.A. v. United States*,
 582 F.3d 1336 (Fed. Cir. 2009) ..................................................................... 7, 8

*Papierfabrik August Koehler SE v. United States*,
 843 F.3d 1373 (Fed. Cir. 2016) .................................................................... 9, 16

*PSC VSMPO-Avisma Corp. v. United States*,
 688 F.3d 751 (Fed. Cir. 2012) ......................................................................... 7

*Ventas, Inc. v. United States*,
 381 F.3d 1156 (Fed. Cir. 2004) ...................................................................... 13

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) .................................................................................. 7

**Statutes**

19 U.S.C. § 1677b ................................................................................. 11, 12

19 U.S.C. § 1677e ........................................................................... 8, 9, 16, 21


**Regulations**

19 C.F.R. § 351.308(c) ............................................................................... 9

**Administrative Decisions**

*Aluminum Wire and Cable from the People's Republic of China: Final Affirmative
   Determination of Sales at Less Than Fair Value,*
84 Fed. Reg. 58,134 (October 30, 2019) ...................................................... 19

*Certain Steel Grating from the People's Republic of China: Final Determination of Sales at Less
   than Fair Value,*
75 Fed. Reg. 32,366 (June 8, 2010) ............................................................ 19

*Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Final
   Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative
   Determination of Critical Circumstances,*
84 Fed. Reg. 32707 (July 9, 2019) .............................................................. 19

*Issues and Decision Memorandum For the Final Affirmative Determination of the Antidumping
   Duty Investigation of Welded Stainless Pressure Pipe From Thailand,*
79 ITADOC 31093 (Dep't of Commerce May 30, 2014) ........................... 17

*Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol From the
   Republic of Korea,*
68 Fed. Reg. 47,540 (Aug. 11, 2003) .......................................................... 14

*Notice of Final Determination of Sales at Less Than Fair Value and Termination of Critical
   Circumstances Investigation: Electrolytic Manganese Dioxide from Australia,*
73 Fed. Reg. 47,586 (Aug. 14, 2008) .......................................................... 14

*Silicon Metal From Bosnia and Herzegovina, Iceland, and Malaysia: Initiation of Less-Than-
   Fair-Value Investigations,*
85 Fed. Reg. 45,177 (July 27, 2020) ............................................................ 3

*Silicon Metal from Bosnia and Herzegovina and Iceland: Preliminary Affirmative
Determinations of Sales at Less Than Fair Value,*
85 Fed. Reg. 80,009 (Dep't of Commerce Dec. 11, 2020) ............................................ 4

*Silicon Metal from Bosnia and Herzegovina and Iceland: Final Affirmative Determinations of
Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances
for Iceland,*
86 Fed. Reg. 11,720 (Dep't of Commerce Feb. 26, 2021) ............................................ 2

*Welded Stainless Pressure Pipe From Malaysia, Thailand, and the Socialist Republic of
Vietnam: Initiation of Antidumping Duty Investigations,*
78 Fed. Reg. 35253-01 (Dep't of Commerce June 12, 2013) ...................................... 17

*Welded Stainless Pressure Pipe from Thailand: Final Determination of Sales at Less Than Fair
Value,*
79 Fed. Reg. 31,093 (Dep't of Commerce May 30, 2014) .......................................... 17

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE**: **THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE**

| | |
|---|---|
| **GLOBE SPECIALTY METALS, INC. and MISSISSIPPI SILICON LLC,** ) ) ) ) | |
| *Plaintiffs*, ) | **Court No. 21-00231** |
| ) | |
| **v.** ) | |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| *Defendant*. ) ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment on the agency record filed by plaintiffs Globe Specialty Metals, Inc. (GSM) and Mississippi Silicon LLC (MS), challenging the U.S. Department of Commerce's (Commerce) final determination in the antidumping duty investigation of silicon metal from Bosnia and Herzegovina (Bosnia).  As demonstrated below, plaintiffs' motion should be denied because Commerce's final determination is supported by substantial evidence and is in accordance with the law.  Accordingly, we respectfully request that the Court deny plaintiffs' motion and enter judgment in favor of the United States.

**STATEMENT PURSUANT TO RULE 56.2(c)(1)**

**I.      Administrative Determination Under Review**

Plaintiffs challenge the final determination of the antidumping duty investigation of silicon metal from Bosnia, published as *Silicon Metal from Bosnia and Herzegovina and Iceland: Final Affirmative Determinations of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances for Iceland,* 86 Fed. Reg.

11,720 (Dep't of Commerce Feb. 26, 2021) (*Final Determination*) (PR 70) and

accompanying Issues and Decision Memorandum, dated February 22, 2021 (*IDM*) (PR

61).

## II.    Issue Presented For Review

Whether Commerce's use of Ferroglobe PLC's (Ferroglobe's) financial statements in

calculating normal value based on constructed value was supported by substantial evidence and

is in accordance with the law.

## STATEMENT OF FACTS

## I.   The Petition And The Initiation Of The Investigation

Plaintiffs, who are domestic producers of silicon metal, filed an antidumping duty

petition with Commerce on June 30, 2020, alleging that silicon metal imported from Bosnia

was being sold in the United States at less than fair value, and that imports of this product were

materially injuring the silicon metal industry in the United States.  *See Petitions for the*

*Imposition of Antidumping and Countervailing Duties: Silicon Metal from Bosnia and*

*Herzegovina, Iceland, the Republic of Kazakhstan, and Malaysia*, dated June 29, 2020

(*Petition*) (PR 1–11).  Citing their inability to obtain financial statements from Bosnian

producers, plaintiffs estimated Bosnian producers' costs of production using financial data from

a Norwegian producer (Elkem ASA), that has no connection to this investigation apart from

being a producer of silicon that plaintiffs selected for this purpose.  Petition (PR 6) at 10–11.

On July 6, 2020, Commerce issued a deficiency questionnaire instructing plaintiffs to

recalculate the costs of production alleged in the petition using the financial statements of a

Bosnian producer, or if information regarding a Bosnian producer was not available, to

recalculate based on the financial statements of one of the petitioning companies and to provide

those statements.  *See* Commerce Letter, *Petition for the Imposition of Antidumping Duties on*

*Imports of Silicon Metal from Bosnia and Herzegovina: Supplemental Questions*, dated July 6, 2020 (PR 16, CR 12) at 4.  In response to Commerce's deficiency questions, the plaintiffs provided the financial statements of Ferroglobe, the parent company of one of the plaintiffs. *Silicon Metal from Bosnia and Herzegovina: Petition Supplement*, dated July 8, 2020 (CR 14) at 29–238.  However, citing two decisions from 2002 and 2003, plaintiffs refused to recalculate their alleged margin using on their own financial statements on the grounds that Ferroglobe and its North American segment experienced losses instead of profits in 2019.  *Id.* at 10–12.

Because of plaintiffs' refusal to recalculate using one of their financial statements as requested, Commerce had to calculate an estimated dumping margin using the financial statements itself—and, because Ferroglobe experienced a loss, set the constructed value (CV) profit ratio to zero, resulting in a revised petition margin of 21.41 percent.  *See Antidumping Duty Initiation Checklist*, dated July 20, 2020 (*Initiation Checklist*) (PR 24) at 8; *IDM* at 2.

Commerce initiated an investigation on July 27, 2020, setting the period of investigation as April 1, 2019, through March 31, 2020, and assigning a 21.41 percent estimated dumping margin for Bosnia.  *See Silicon Metal From Bosnia and Herzegovina, Iceland, and Malaysia: Initiation of Less-Than-Fair-Value Investigations,* 85 Fed. Reg. 45,177 (*Initiation Notice*) (PR 23) at 2, 10.  Commerce selected one mandatory respondent, R-S Silicon D.O.O. (RSS), representing the largest exporter of silicon metal from Bosnia during the period of investigation. *See* Commerce Memo, *Less-Than-Fair-Value Investigation of Silicon Metal from Bosnia and Herzegovina: Respondent Selection Memo*, dated August 12, 2020 (PR 28) (CR 20).

Relevant to this case, in September 2020, RSS submitted its response to section A of the original Anti-Dumping questionnaire (i.e., the section relating to general information). *Antidumping Duty Investigation of Silicon Metal from Bosnia and Herzegovina: R-S Silicon*

*Section A Questionnaire Response*, dated Sept. 16, 2020 (PR 43, CR 21). However, in the same

month, RSS notified Commerce of its intent not to respond further in the investigation.

*Antidumping Duty Investigation of Silicon Metal from Bosnia and Herzegovina: R-S Silicon*

*Intent Not to Respond*, dated Sept. 30, 2020 (PR 44).

On October 6, 2020, the plaintiffs requested that Commerce apply total facts available

with adverse inferences to RSS and assign an adverse facts available (AFA) rate of 39 percent

to the company. *Silicon Metal from Bosnia and Herzegovina: Request for Application of Total*

*Facts Available with Adverse Inferences to R-S Silicon D.o.o.*, dated Oct. 6, 2020 (PR 46, CR

26). Notably, in so requesting, plaintiffs acknowledged that "the Department typically assigns

the highest estimated dumping margin from its initiation notice as the AFA rate in these

situations, which is 21.41 percent for Bosnia and Herzegovina in this case," *id.* at 2. On

October 9, 2020, RSS responded by stating Commerce should apply the highest estimated

dumping rate stated in the *Initiation Notice* of 21.41 percent. *Antidumping Duty Investigation*

*of Silicon Metal from Bosnia and Herzegovina: Reply to Petitioners' Request for Application of*

*Total Facts Available with Adverse Inferences*, dated Oct. 9, 2020 (PR 47).

**II.    The Preliminary Determination**

On December 11, 2020, Commerce issued its preliminary determination and preliminary

decision memorandum. *See Silicon Metal from Bosnia and Herzegovina and Iceland:*

*Preliminary Affirmative Determinations of Sales at Less Than Fair Value*, 85 Fed. Reg. 80,009

(Dep't of Commerce Dec. 11, 2020) (Preliminary Determination) (PR 69); Preliminary

Decision Memorandum (PDM) (PR 48). In its Preliminary Determination, Commerce applied

total facts available with adverse inference to RSS and assigned an AFA rate of 21.41 percent

based on the estimated weighted-average dumping margin relied on in the *Initiation Checklist*.

PDM at 6; *Initiation Checklist* at 8. Because the adverse facts available rate was derived from

information in the petition and the supplements to the petition, Commerce corroborated the AFA rate, key elements of the export price, and normal value calculations, by examining information from various independent sources provided in the petition and in the supplements to the petition.  PDM at 7.  Although the plaintiffs submitted a revised calculation in the supplement to the petition for an alleged margin of 39.00 percent, this revised margin was not calculated using the financial statements of the plaintiffs (or a parent company), as requested by Commerce.  *Id.*  Thus, based on Commerce's preference not to use statements from third countries to calculate constructed value ratios, Commerce corroborated the recalculated rate of 21.41 percent found in the *Initiation Notice*, which Commerce had calculated using Ferroglobe's financial statements.  *Id.* at 8–9.

### III.   **The Final Determination**

Commerce issued its final determination and issues and decision memorandum on February 22, 2021.  *See Final Determination*; *IDM*.  In the Final Determination, Commerce continued to use the margin from the *Initiation Notice*, which was calculated using Ferroglobe's financial statements, as the adverse facts available rate for RSS.  *IDM* at 6, 11.  Commerce explained that data from Ferroglobe would have at least two advantages over data from plaintiffs' hand-picked company:  First, because "the petitioners calculated the cost of production based on their own experience," Commerce "{found} it appropriate to base the CV ratios on that petitioner's parent company" so that the "usage rates and CV ratios have a link to the same source."  *Id.* at 9.  Second, Commerce explained that it was "continu{ing} to not rely on third-party financial statements" and provided many examples of this practice.  *Id.* at 9–10 n.48.  Commerce further explained that "{a}lthough the parent company is headquartered abroad, its financial statements include the data from the petitioner itself, making Ferroglobe's financial statements, at least in part, reflective of the financial data of that U.S. producer,"

whereas "Elkem's financial statements represent entirely third-country based data with no element of cost from either the country under investigation or a U.S. producer." *Id.* at 9.

Commerce confirmed the accuracy and validity of the information underlying the calculation of the dumping margin used in the *Initiation Notice* by examining source documents and affidavits, as well as publicly available information. *Id.* at 10. Nothing in the record calls into question the validity of the information supporting the export price and normal value calculations provided in the *Initiation Checklist*. *Id.* Accordingly, Commerce found the use of the dumping margin in the *Initiation Notice* of 21.41 percent was consistent with the Tariff Act of 1930, as amended (the Act), and Commerce's practice, and was reliable for the purposes of the underlying investigation. *Id.* at 10.

## SUMMARY OF THE ARGUMENT

Plaintiffs refused to comply with Commerce's instructions to revise their calculations, which relied on information regarding a *non-party* located in *neither the home country* (Bosnia) *nor the United States*, and now seek to force Commerce to use that information simply because plaintiffs hand-picked that producer for inclusion in their petition. In so doing, plaintiffs ask this Court to diminish Commerce's discretion, ignore Commerce's well-established practices, and overturn a decision supported by substantial evidence. Because Commerce acted well within its discretion in applying a 21.41 percent dumping margin, this Court should sustain Commerce's final determination and reject plaintiffs' attempts to substitute their own discretion for Commerce's.

## ARGUMENT

### I.   Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade *must* sustain 'any determination, finding, or conclusion found' by Commerce unless it is

'unsupported by substantial evidence upon the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)) (emphasis added).  "Substantial evidence" is "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (citations omitted).  In other words, it is improper to overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007), and the Court will not substitute its judgment for that of Commerce in choosing between two fairly conflicting views, even if it could justifiably have made a different choice had the matter been before it *de novo*, *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006).

Moreover, the Court of Appeals for the Federal Circuit has made clear that "{a}bsent constitutional constraints or extremely compelling circumstances the administrative agencies should be free . . . to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties."  *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012) (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543–44 (1978)).  "Accordingly, absent such constraints or circumstances, courts will defer to the judgment of an agency regarding the development of the agency record."  *Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015) (*Dongtai Peak*) (citing *PSC VSMPO*, 688 F.3d at 760).  "To do otherwise would 'run the risk of propelling the courts into the domain which Congress has set aside exclusively for the administrative agency.'"  *PSC VSMPO*, 688 F.3d at 760 (cleaned up) (quoting *FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)).

## II.   Commerce's Decision To Use Ferroglobe's Financial Statements Is Supported By Substantial Evidence And In Accordance With Law

As stated above, this Court "*must* sustain 'any determination, finding, or conclusion found' by Commerce unless it is 'unsupported by substantial evidence upon the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd.*, 88 F.3d at 1038 (emphasis added); *accord* 19 U.S.C. § 1516a(b)(1)(B)(i).  As explained below, plaintiffs' arguments fail to meet this standard.  To be clear: despite some language primarily found in plaintiffs' headings, plaintiffs do not contend that Commerce failed to abide by a statute or regulation and do not contend that a factual determination Commerce reached lacks a basis in the record (i.e., substantial evidence).  Instead, plaintiffs' arguments rest primarily on their (misguided) interpretation of Commerce's past practices, under which Commerce's purported preference for using financial statements from profitable companies supposedly defeats Commerce's preference for using financial statements from domestic, petitioning companies.  In so doing, plaintiffs ignore Commerce's explanations founded on its well-established practices, rely on inapposite decisions to confer outsized importance to outdated practices, and attempt to blur the distinction between a company having substantial business in the United States and one having none.  As demonstrated below, these arguments lack merit.

Plaintiffs do not challenge Commerce's decision to resort to "adverse facts available," but dispute only how this AFA rate was calculated.  However, the statute and the regulation governing such determinations provide Commerce with substantial discretion as to what sources it may use to establish this rate.  *Accord PAM*, 582 F.3d at 1340 ("Commerce's discretion in applying an AFA margin is particularly great when a respondent is uncooperative by failing to provide or withholding information." (citing 19 U.S.C. § 1677e)); Statement of Administrative Action (SAA), H.R. Doc. No. 103-316, at 840 (1994) (emphasizing the case-by-case nature of

selecting sources by stating that it was inappropriate "to establish particular methods or benchmarks for applying this alternative").  The relevant statutory and regulatory sections provide that, in selecting from adverse facts available, Commerce "*may*" rely on information from (1) the petition, (2) the final determination in the investigation, (3) any previous administrative review, or "(4) any other information placed on the record."  *See* 19 U.S.C. § 1677e(b) (emphasis added); 19 C.F.R. § 351.308(c) (same).  Because Ferroglobe's financial statements are "other information placed on the record," *id.*; *see Petition Supplement* (CR 14) at 29–238, the "statute . . . expressly permitted Commerce to turn to" them, *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1380 (Fed. Cir. 2016).  Accordingly, plaintiffs cannot show that Commerce's decision was in violation of a statute or regulation.

Instead, plaintiffs' argument appears to be that Commerce abused its discretion.  Relevant to plaintiffs' arguments, "Commerce abuses its discretion . . . if it departs from a consistent practice without reasonable explanation."  *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1342 (Fed. Cir. 2021).  However, plaintiffs have not established that Commerce's decision to use the 21.41 rate represents a departure from a consistent practice—much less an unexplained one.

Because financial information from a Bosnian producer was not available, Commerce's potential sources from which to select an AFA in this investigation were limited.  Commerce could resort either to (a) financial statements from an entirely third-country producer, Elkem, or to (b) financial statements from the parent company of one of the (U.S. producer) plaintiffs, which plaintiffs provided to Commerce.  *IDM* at 2.  Although plaintiffs argue that Commerce should have exercised its discretion to use Elkem's financial statements for calculation of the constructed value financial ratios, Commerce reasonably determined that Ferroglobe's financial statements were preferable because of (1) "Commerce's practice of relying on the petitioner's

own data for initiation purposes in the absence of in-country information," *id.* at 10, and (2) Commerce's general practice not to "rely on the third-country financial statements," *id.* at 9. Accordingly, Commerce selected the financial statement linked to a U.S. producer over the financial statements from a third-country producer.

As evidenced by the numerous other determinations Commerce cited in the *IDM*, Commerce frequently uses financial statements of a U.S. producer of comparable merchandise to calculate normal value based on constructed value for initiations when no in-country data are available. *See id.* at 9–10 n. 48 (citing, *inter alia*, *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 85 FR 23002 (April 24, 2020), and accompanying Indonesia Initiation Checklist at 9 (using a U.S. producer's financial statements); *Carbon and Alloy Steel Wire Rod from Belarus, Italy, the Republic of Korea, the Russian Federation, South Africa, Spain, the Republic of Turkey, Ukraine, United Arab Emirates, and United Kingdom: Initiation of Less-Than-Fair-Value Investigations*, 82 FR 19207 (April 26, 2017), and accompanying United Arab Emirates Initiation Checklist at 9–10 (using a U.S. producer's financial statements)).  This is done in accordance with Commerce's practice of relying on a petitioner's own data for initiation purposes in the absence of in-country information, as well as Commerce's preference for not using third-country financial statements to calculate constructed value profit and selling expense ratios.  *Id.* at 6, 10.

Plaintiffs argue that Ferroglobe, like Elkem, "also is located in a third country," so Commerce's justification for using information from Ferroglobe over Elkem is a "canard." Plaintiffs' Motion for Judgment on the Administrative Record (MJAR) (ECF No. 19) at 4.  At most, however, this argument only applies to the second rationale (concerning Commerce's

preference to not rely on third-country financial statements)—not the first (concerning

Commerce's preference to use petitioners' own financial statements).  In any case, this argument

attempts to gloss over very real differences between Ferroglobe and Elkem.  As Commerce

explained in the *IDM*, "{a}lthough the parent company is headquartered abroad, its financial

statements include the data from the petitioner itself, making Ferroglobe's financial statements,

at least in part, reflective of the financial data of that U.S. producer."  *IDM* at 9.  This made

Ferroglobe's financial statements preferable to Elkem's financial statements, because Elkem's

statements "represent entirely third-country based data with no element of cost from either the

country under investigation or a U.S. producer."  *Id.*  Moreover, because "the petitioners

calculated the cost of production based on their own experience," and thus, Commerce is

"applying usage rates from a petitioner's own experience," it would be "appropriate to base the

{constructed value} ratios on that petitioner's parent company" so that "the usage rates and CV

ratios have a link to the same source." *Id.*  Plaintiffs have not demonstrated anything arbitrary or

irrational about this reasoning.

    Plaintiffs next argue that Commerce's reliance on information from Ferroglobe violated

Commerce's practice of not relying on financial information from companies that suffered

losses.  MJAR at 24–28.  This argument fails for at least two reasons.

    To begin, there is nothing in the statute that requires that Commerce use financial

statements showing a profit.  In calculating normal value based on constructed value, Commerce

normally calculates a constructed value profit ratio using the preferred method under section 19

U.S.C. § 1677b(e)(2)(A) of the Act, i.e., based on the *respondent's* own home-market or third-

country sales made in the ordinary course of trade.  19 U.S.C. § 1677b(e).  When the preferred

method is unavailable, Commerce relies on one of the three alternatives outlined in sections 19

U.S.C. § 1677b(e)(2)(B)(i) through (iii).  Those alternatives are:  (i) the use of the actual amounts incurred and realized by the specific exporter or producer in connection with the production and sale of merchandise that is in the same general category of products as the subject merchandise; (ii) the use of the weighted average of the actual amounts incurred and realized by exporters or producers (other than the respondent) that are subject to the investigation or review in connection with the production and sale of a foreign like product; or (iii) "the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers {other than the respondent} in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise . . . ." 19 U.S.C. § 1677b(e)(2)(B).

The statute does not establish a hierarchy for selecting among the alternatives for calculating constructed value profit.  *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316 (1994) (SAA) at 840 ("At the outset, it should be emphasized, consistent with the Antidumping Agreement, new section 773(e)(2)(B) does not establish a hierarchy or preference among these alternative methods.  Further, no one approach is necessarily appropriate for use in all cases.").  Moreover, as explained in the Statement of Administrative Action, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data."  *See* SAA at 840.[1]  Thus, Commerce

---

[1]  Ironically, plaintiffs attempt to somehow portray the fact that the SAA did not "establish particular methods and benchmarks for applying this alternative," as a straight-jacket confining Commerce to use any third-country, third-party source a plaintiff selects.  *See* MJAR at 22.

has discretion to select from any of the three alternative methods, depending on the information available on the record.

Here, the information in the record only permitted Commerce to select option three—"any other reasonable method"—because the only respondent in the underlying investigation was non-responsive.  *See* Statement Of Facts, *supra*.  Plaintiffs argue that the fact that there is a "cap on the amount of profit that will be included" under this option "inherently assumes that the agency will rely on a source that does not have zero profit or a loss."  MJAR at 18.  However, plaintiffs adduce no authority for this proposition, and we are aware of none.  In any case, a basic canon of statutory interpretation militates the *exact opposite* result: because the statute explicitly sets an exception capping the amount of profit that can be included from surrogate financial statements, the absence of an exception in the form of a profit floor means that there is no *minimum* profit requirement in surrogate financial statements.  *See, e.g.*, *Ventas, Inc. v. United States*, 381 F.3d 1156, 1161 (Fed. Cir. 2004) ("Where Congress includes certain exceptions in a statute, the maxim *expressio unius est exclusio alterius* presumes that those are the only exceptions Congress intended.").

In any case, plaintiffs have not pointed to any authority for the proposition that Commerce's preference for profitable companies must triumph over Commerce's practice of using financial statements from U.S. producers when no in-country data is available.[2]  As explained below, plaintiffs' cases do not show Commerce relying on third-country data for calculating constructed value when adequate financial information about U.S. producers was

---

[2] For example, in *Catfish Farmers of Am. v. United States*, 641 F.Supp.2d 1362 (Ct. Int'l Trade 2009), the dispute was whether Commerce was reasonable in choosing to use a profitable third-country seafood processor to derive surrogate financial ratios for a nonmarket economy company to the exclusion of another third-country seafood processor that was not profitable.  *Id.* at 1378.

available.  *See* MJAR at 21–22.   Rather, Commerce only used third-country financial statements when there were no financial statements covering home market sales or from a U.S. producer available on the record.  *Id*.  Here, however, Commerce had record information available that was linked to one of the petitioning companies, which included data from a U.S. producer that could be used to calculate constructed value.  *IDM* at 2, 10.  Thus, none of these cases support plaintiffs' position.

Plaintiffs argue, largely based on *EMD from Australia* and *PVA from Korea*, that Commerce has a practice of not selecting rates as adverse facts available when those rates were calculated using financial statements showing a loss.  *See* MJAR at 24–31.  However, these cases do not show that Commerce has a practice of prioritizing profitable financial statements from third-country producers over those of U.S. producers that show a loss when calculating constructed value for initiation.  In fact, in both of these cases, Commerce ultimately relied on profitable financial statements from other producers in the country of investigation, and *not* financial statements from a third country producer.  *See Notice of Final Determination of Sales at Less Than Fair Value and Termination of Critical Circumstances Investigation: Electrolytic Manganese Dioxide from Australia*, 73 Fed. Reg. 47,586 (Dep't of Commerce Aug. 14, 2008); *Issues and Decision Memorandum* at 5–6 (Commerce chose to calculate constructed value based on an Australian producer with home market sales); *Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol From the Republic of Korea*, 68 Fed. Reg. 47,540 (Dep't of Commerce Aug. 11, 2003); Issues and Decision Memorandum at Comment 1 (Commerce used a Korean producer with home market sales as a surrogate company from which to select a reasonable constructed value profit rate).

Unlike in *EMD from Australia*, in the underlying investigation Commerce did not have

profitable surrogate financial statements from the country of investigation that could be used in calculating constructed value. *IDM* at 2. *PVA from Korea* likewise represented a different set of facts, in which Commerce had a source for calculating constructed value that included both U.S. sales and home market sales in their financial statements. *See PVA from Korea* at Comment 1. By contrast, in this investigation, Commerce was faced with the options of using either financial statements from Elkem, an entirely third-country producer, or financial statements from Ferroglobe, a parent company of one of the petitioning companies whose financial data included financial statements from a U.S. producer. *IDM* at 2, 9.

When Commerce selects an alternative method for calculating normal value based on constructed value, Commerce's practice, in the absence of in-country information, is to rely on petitioner's own data, in the form of financial statements from U.S. producers, over a third-party producer for initiation purposes. *Id.* at 9–10.[3] Commerce acted in accordance with this practice when it used Ferroglobe's financial statements, which were the only fully audited financial statements provided by plaintiffs in response to Commerce's request, to calculate normal value based on constructed value. *Id.* at 2, 9, 10.

Plaintiffs next argue that Elkem's financial information is superior to Ferroglobe's because the latter reflects a company involved in a "wide range of business activities," including the production of silicon metal, whereas Elkem is a "pure-play producer of silicon metal" like

---

[3] Plaintiffs' citations to *Mid Continent Steel & Wire, Inc. v. United States*, 273 F. Supp. 3d 1348, 1351–53 (Ct. Int'l Trade 2017), *aff'd in part*, 941 F.3d 530, 542–43 (Fed. Cir. 2019) and *Husteel Co., Ltd. v. United States*, 180 F. Supp. 3d 1330, 1343–46 (Ct. Int'l Trade 2016), *aff'd*, 710 Fed. Appx. 890 (Fed. Cir. 2018) are not to the contrary. *See* MJAR at 21–22. Neither of those cases addressed Commerce's method of selecting an AFA rate, nor did those cases address whether Commerce should have used third-country financial information over financial information regarding a petitioner operating in the United States.

RSS.  MJAR at 4.  As a preliminary matter, as plaintiffs admit, "Petitioners also provided

separate financial data for GSM, a subsidiary of Ferroglobe, which were used to compile the

aggregated financial data forming the basis of Ferroglobe's audited consolidated financial

statements."  MJAR at 24.  More importantly, plaintiffs adduce no authority for the proposition

that the surrogate company must only (or even primarily) produce the product at issue, and we

are aware of none.  In fact, the Trade Preferences Extension Act of 2015 made clear that, in

applying an adverse inference in selecting among the facts otherwise available, Commerce "is

not required" to demonstrate that the "dumping margin used" "reflects an alleged commercial

reality of the interested party" for "any" purpose.  19 U.S.C. § 1677e(d)(3).  Accordingly, the

relevance of Ferroglobe's other operations is neither established nor apparent.[4]

Finally, plaintiffs argue that "Commerce's practice is to select, as an AFA rate, the higher

of: (1) the highest dumping margin alleged in the petition, or (2) the highest calculated rate of

any respondent in the investigation."  MJAR at 15, 28–31.  According to plaintiffs, the fact that

the sole mandatory respondent did not provide sufficient information to calculate a rate required

Commerce to accept the highest rate alleged in their petition.  *Id.*

However, this framework does not reflect Commerce's current "practice when making

adverse inferences," which is to "select the higher of: (1) the highest margin stated *in the notice

of initiation*; or (2) the highest margin calculated for any respondent."  *Papierfabrik Aug.

Koehler SE v. United States*, 843 F.3d 1373, 1380 (Fed. Cir. 2016) (emphasis added) (noting

that plaintiff did not disprove this practice).  In other words, as explained in the *IDM*,

---

[4] Plaintiffs' attempt to use their own statement (which Commerce merely acknowledged as their statement) for the proposition that "all silicon metal producers use essentially the same inputs and production process," MJAR at 23, would, at most, show that Elkem might be an acceptable (but not mandatory) surrogate company.

Commerce has a practice of corroborating the rate found in the *Initiation Notice* and applying that rate as adverse facts available.  *See IDM* at 7–8.  Notably, even plaintiffs have acknowledged that "the Department typically assigns the highest estimated dumping margin from its initiation notice as the AFA rate in these situations, which is 21.41 percent for Bosnia and Herzegovina in this case . . . ."  *See Silicon Metal from Bosnia and Herzegovina: Request for Application of Total Facts Available with Adverse Inferences to R-S Silicon D.o.o.*, dated Oct. 6, 2020 (PR 46, CR 26) at 2.

      Plaintiffs' citation to *Welded Stainless Pressure Pipe from Thailand: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 31,093 (Dep't of Commerce May 30, 2014) is not to the contrary because, in that case, the initiation margin was not adjusted from the petition margin, so there was no reason for Commerce to make any distinction between the petition margin and the initiation margin.  *See Welded Stainless Pressure Pipe From Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Antidumping Duty Investigations*, 78 Fed. Reg. 35253-01 (Dep't of Commerce June 12, 2013) (initiation notice accepting that the "estimated dumping margins for welded stainless pipe from Thailand range from 23.77 percent to 24.01 percent").  Notably, the Issues and Decision Memorandum in that case cited a related Commerce decision in which the margins alleged in the petition had been "adjusted at initiation," and Commerce ultimately selected an even higher rate based on information obtained during the course of the investigation.  *See Issues and Decision Memorandum For the Final Affirmative Determination of the Antidumping Duty Investigation of Welded Stainless Pressure Pipe From Thailand*, 79 ITADOC 31093 (Dep't of Commerce May 30, 2014).  Here, the margin alleged in plaintiffs' petition was also "adjusted at initiation" in accordance with Commerce's current practices.  And, as explained above,

plaintiffs have not established that Commerce was unreasonable in adjusting the petition rate in

arriving at the initiation rate.

The other Commerce decisions on which plaintiffs rely, *EMD from Australia* and *PVA

from Korea*—which are from 2003 and 2008—represent a prior practice that Commerce has

subsequently changed, under which it would revisit the initiation margin when selecting it for

use as an AFA, potentially recalculating it using information later obtained in those

investigations or evaluating whether it was sufficiently adverse.  *IDM* at 7–9.  In each of those

cases, Commerce recalculated the rates under the premise that rates initially calculated based on

financial statements showing a loss would not be adverse, but would rather benefit the non-

cooperative respondents.  *See* MJAR at 26 (quoting *EMD from Australia* and accompanying

*IDM* at 6).

However, this practice has since been superseded by Commerce's current practice of not

recalculating the initiation rate when selecting it as adverse facts available.  Under Commerce's

current practice, Commerce seeks to evaluate and confirm the reliability of the information

presented in a petition at the time of the initiation of an investigation, and then Commerce only

corroborates the margin in the initiation notice when selecting an AFA rate.  *IDM* at 7–8 (citing

*Aluminum Wire and Cable from the People's Republic of China: Final Affirmative

Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 58134 (Dep't of Commerce

October 30, 2019) and accompanying Issues and Decision Memorandum at Comment 1).

Commerce's current policy and practice is based on the fact that Commerce has no ability to

evaluate whether the adverse facts available rate is sufficiently adverse when there are no

participating respondents, there are no calculated rates, and there is no order in place.  *See IDM*

at 8 (citing *Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of*

*China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 Fed. Reg. 32707 (Dep't of Commerce July 9, 2019) and accompanying IDM at Comment 1 (*Steel Wheels from China*).

Commerce has followed this practice now for over a decade, and has consistently stated that it does not revisit the initiation margin when selecting it for use as AFA. *See IDM* at 7–8 (citing *Certain Steel Grating from the People's Republic of China: Final Determination of Sales at Less than Fair Value*, 75 Fed. Reg. 32,366 (Dep't of Commerce June 8, 2010) (*Steel Grating from China*), and accompanying Issues and Decision Memorandum at Comment 2; *Aluminum Wire and Cable from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 58,134 (Dep't of Commerce October 30, 2019), and accompanying Issues and Decision Memorandum at Comment 1). Further evidence of this change in practice since the determinations in *EMD from Australia* and *PVA from Korea* can be found in Commerce's inclusion of language in the initiation notices for *EMD from Australia* and *PVA from Korea* stating Commerce would consider alternative options for calculating profit if it became necessary to rely on the constructed value-based margin from the petition for adverse facts available. *See IDM* at 7, n. 35. However, this language is no longer included in Commerce's initiation notices, and was not included in the *Initiation Notice* in the underlying investigation. *See Initiation Notice*.

In the investigation in this case, Commerce took the same approach as it has in other investigations presenting similar circumstances, such as in *Steel Wheels from China*. Like *Steel Wheels from China*, the underlying administrative proceeding involved an investigation where no respondents participated, no order was in place, and there were no calculated rates that could be used to determine whether the adverse facts available rate would be sufficiently adverse in the

context of a producer's actions over a period of time under the discipline of an order. *IDM* at 8, n.38. In accordance with this current practice under this set of facts, Commerce corroborated the dumping margin found in the *Initiation Notice*, determined that the margin was reliable and had probative value, and thus was appropriate to use as an adverse facts available rate. *Id.* at 8–9.[5]

In short, the practice exemplified in the decisions plaintiffs cite is no longer a current practice, and has not been for many years. *Id.* at 7–9. This is demonstrated by the cases spanning over a decade that Commerce referenced in the IDM as evidence of its current practice, which replaced the practice plaintiffs rely on in their arguments. *Id.* at 7–8 & n. 36, 38–40. When Commerce selects an alternative method for calculating normal value based on constructed value, Commerce's practice, in the absence of in-country information, is to rely on petitioner's own data, in the form of financial statements from U.S. producers, over a third-party producer for initiation purposes. *Id.* at 9–10. Commerce thus used Ferroglobe's financial statements, which were the only fully audited financial statements provided by plaintiffs in response to Commerce's request, to calculate normal value based on constructed value. *Id.* at 2, 9, 10. Contrary to plaintiffs' argument, it would have been against Commerce's current practice to evaluate the margin contained in the *Initiation Notice* to determine whether it was sufficiently adverse under the circumstances—and there was nothing in the record to make this evaluation. *See id.* at 7–9.

In short, Commerce acted in accordance with its current practice when it based the AFA rate on the initiation rate of 21.41 percent, which as discussed above, was reasonably

---

[5] No record information called into question the validity of the source of information or the validity of the information supporting the export price and normal value calculations provided in the *Initiation Checklist*. *Id.*

determined based on Ferroglobe's financial statements.[6]

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's

determination and enter judgment in favor of the United States.

<div style="margin-left: 50%;">

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

</div>

OF COUNSEL:

W. Mitch Purdy
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance

/s/ Bret R. Vallacher
BRET R. VALLACHER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 616-0465
Facsimile: (202) 305-2062
Email: bret.r.vallacher@usdoj.gov

*Attorneys for Defendant*

Dated December 20, 2021

---

[6]  Plaintiffs at times appear to suggest that this rate was so low that RSS secretly wanted it to apply because it would be more favorable than the rate it would be assigned if RSS had participated.  *See* MJAR at 12, 14, 30 n. 7, 33.  Such musings are not only speculative, but also irrelevant.  *See* 19 U.S.C. § 1677e(b)(1) (Commerce "is not required to determine, or make any adjustments to" a "weighted average dumping margin based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information."); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Circ. 2003) (holding that Commerce may apply an adverse inference for a respondent's "failure to cooperate to the best of respondent's ability, *regardless of motivation or intent*" (emphasis added)).

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the word-count limitation, in that it contains 6676 words according to the word-count function of the word-processing software used to prepare the memorandum, including text, footnotes, and headings.

<u>/s/Bret Vallacher</u>

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of December, 2021, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to counsel of record.

/s/ Bret R. Vallacher