**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  HON. THOMAS J. AQUILINO, JR., SENIOR JUDGE**

| | | |
|---|---|---|
| **GLOBE SPECIALTY METALS, INC. and MISSISSIPPI SILICON LLC,** | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Court No. 21-00231** |
| **UNITED STATES,** | ) ) | **PUBLIC VERSION** |
| Defendant. | ) ) ) | |

**PLAINTIFFS' REPLY BRIEF**

Adam H. Gordon
Jennifer M. Smith
Ping Gong
Lauren Fraid
**THE BRISTOL GROUP PLLC**
1707 L Street, N.W.
Suite 570
Washington, DC 20036
T: (202) 991-2700
E: adam.gordon@bristolgrouplaw.com
*Counsel to Globe Specialty Metals, Inc. and Mississippi Silicon LLC*

Dated: February 8, 2022

**TABLE OF CONTENTS**

**Page**

**TABLE OF CONTENTS** ..................................................................................................I

**TABLE OF AUTHORITIES** ..................................................................................... **II**

**SUMMARY OF ARGUMENT** ..................................................................................... **1**

**ARGUMENT** ................................................................................................................. **1**

I.  COMMERCE MISCHARACTERIZES PLAINTIFFS' ACTIONS DURING THE INITIATION PHASE AND IGNORES ITS OWN PRECEDENT BY USING THE FINANCIAL STATEMENT OF AN UNPROFITABLE COMPANY AS THE BASIS FOR THE FINANCIAL RATIOS ................................................................................. 1

II.  COMMERCE HAS MISCONSTRUED KEY RECORD FACTS AS THEY PERTAIN TO FERROGLOBE AND ELKEM ......................................................................... 6

III. COMMERCE RELIES ON OVERSTATED ADMINISTRATIVE PRECEDENTS THAT DEALT WITH DIFFERENT FACTUAL AND TEMPORAL CIRCUMSTANCES ........ 12

IV. COMMERCE HAS IGNORED OR MISAPPLIED THE INTENT OF THE STATUTORY LANGUAGE ................................................................................................... 13

**CONCLUSION** ........................................................................................................ **16**

# TABLE OF AUTHORITIES

## CASES

*Gold E. Paper (Jiangsu) Co. v. United States*,
  991 F. Supp. 2d 1357 (Ct. Int'l Trade 2014) ........................................................................ 13

*Goodluck India Ltd. v. United States*,
  11 F.4th 1335 (Fed. Cir. 2021) ........................................................................................... 17

*Husteel v. United States*,
  180 F. Supp. 3d 1330, 1346 (CIT 2016) ................................................................................ 5

## STATUTES

19 U.S.C. § 1673a(c)(1)(A)(i) ................................................................................................ 16

19 U.S.C. § 1677b(b)(1) ........................................................................................................ 14

19 U.S.C. § 1677b(e)(2)(B) .................................................................................................... 10

19 U.S.C. § 1677b(e)(2)(B)(iii) .............................................................................................. 14

19 U.S.C. § 1677e(d)(3) ........................................................................................................ 15

## MISCELLANEOUS AUTHORITIES

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
  H.R. Doc. No. 103-316 (1994) ................................................................................ 5, 14, 17

## ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*Aluminum Wire and Cable from the People's Republic of China: Final Affirmative
  Determination of Sales at Less Than Fair Value*,
  84 Fed. Reg. 58,134 (Oct. 30, 2019) ................................................................................... 12

*Carbon and Alloy Steel Wire Rod from Belarus, Italy, the Republic of Korea, the Russian
  Federation, South Africa, Spain, the Republic of Turkey, Ukraine, United Arab Emirates, and
  United Kingdom: Initiation of Less-Than-Fair-Value Investigations*,
  82 Fed. Reg. 19,207 (Apr. 26, 2017) .................................................................................... 6

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results and Partial
  Rescission of the Seventh Antidumping Duty Administrative Review*,
  77 Fed. Reg. 15,039 (Mar. 14, 2012) .................................................................................. 11

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of
  Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-
  2019*,
  86 Fed. Reg. 36,102 (Jul. 8, 2021) ..................................................................................... 11

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Sixth Antidumping Duty Administrative Review and Sixth New Shipper Review*,
76 Fed. Reg. 15,941 (Mar. 22, 2011) ....................................................................... 11

*Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2017-2018*,
84 Fed. Reg. 71,372 (Dec. 27, 2019) ............................................................ 9, 10, 16

*Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*,
84 Fed. Reg. 32,707 (Jul. 9, 2019) ........................................................................ 12

*Magnesium From Israel: Final Affirmative Determination of Sales at Less Than Fair Value*,
84 Fed. Reg. 65,781 (Nov. 29, 2019) .................................................................... 5, 9

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*,
85 Fed. Reg. 23,002 (Apr. 24, 2020), .................................................................... 6

*Notice of Final Determination of Sales at Less Than Fair Value and Termination of Critical-Circumstances Investigation: Electrolytic Manganese Dioxide from Australia*,
73 Fed. Reg. 47,586 (Aug. 14, 2008) .................................................................... 5

*Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol From the Republic of Korea*,
68 Fed. Reg. 47,540 (Aug. 11, 2003) .................................................................... 5

**SUMMARY OF ARGUMENT**

Contrary to its long-established practice and substantial evidence on the record since the very beginning of the underlying proceeding, the U.S. Department of Commerce ("Commerce") selected a demonstrably inferior third-country source for calculating financial ratios (to be used in the constructed value ("CV") buildup) during the initiation phase of the antidumping duty ("AD") investigation of silicon metal from Bosnia and Herzegovina.

In attempting to defend its decision, Commerce: (1) mischaracterizes Plaintiffs' actions during the initiation process and ignores precedent that, despite its contentions, remains relevant; (2) selectively obfuscates or misconstrues the record evidence; (3) overstates administrative precedent from proceedings with fundamentally different factual circumstances; and (4) ignores or misapplies the intent of the statutory language.  Plaintiffs appreciate that, at the outset, Commerce was working within the constraints of the initiation timeframe.  The agency's refusal to reevaluate its actions and correct its error during the balance of the investigation, particularly given that the only respondent had stopped participating and hence the team had ample time and resources available, is contrary to the record evidence, inconsistent with law, and unreasonable on its face.

**ARGUMENT**

**I.      COMMERCE MISCHARACTERIZES PLAINTIFFS' ACTIONS DURING THE INITIATION PHASE AND IGNORES ITS OWN PRECEDENT BY USING THE FINANCIAL STATEMENT OF AN UNPROFITABLE COMPANY AS THE BASIS FOR THE FINANCIAL RATIOS**

Commerce attempts to portray Plaintiffs as bad actors during the initiation stage:

> On July 6, 2020, Commerce issued a deficiency questionnaire instructing plaintiffs to recalculate the costs of production alleged in the petition using the financial statements of a Bosnian producer, or if information regarding a Bosnian producer was not available, to recalculate based on the financial statements of one of the petitioning companies and to provide those

statements. * * * In response to Commerce's deficiency questions, the plaintiffs provided the financial statements of Ferroglobe, the parent company of one of the plaintiffs. * * * However, citing two decisions from 2002 and 2003, plaintiffs refused to recalculate their alleged margin using on {sic} their own financial statements on the grounds that Ferroglobe and its North American segment experienced losses instead of profits in 2019. * * *

Because of plaintiffs' refusal to recalculate using one of their financial statements as requested, Commerce had to calculate an estimated dumping margin using the financial statements itself—and, because Ferroglobe experienced a loss, set the constructed value (CV) profit ratio to zero, resulting in a revised petition margin of 21.41 percent.

*See* Def.'s Br. at 2-3.[1]

Commerce's discussion fundamentally mischaracterizes the events in question.  As an initial matter, Commerce did not ask Plaintiffs to recalculate the petition margin using the financial statements of either one of the petitioning companies, as Commerce's response brief clearly seeks to imply.  *Id*. at 2.  Rather, Commerce specifically asked Plaintiffs to recalculate the petition margin using the financial statement of Globe Specialty Metals, Inc. ("GSM"), if the financial statement of a Bosnian producer was not available:

9.  In Exhibit II-15, you provided financial ratio calculations using the financial statements of Elkem ASA (Elkem), which you identify as a Norwegian silicon metal producer on page 10.

   a.   Please revise your calculation of the fixed overhead (FOH), selling, general and administrative (SG&A), and profit rates that were used to calculate the FOH, SG&A and profit components of COP using the financial statements of a Bosnian producer of merchandise identical or comparable to silicon metal.

---

[1] This passage raises an obvious question:  if Commerce was willing to unilaterally recalculate a Petition margin within a few days' time during the compressed, 20-day initiation schedule using information submitted in the Petition Supplement, how can there be any reasonable basis for its refusal to reevaluate the propriety of that decision later in the investigation, when the only respondent had ceased participating and the team thus had ample resources and time?

      b.    Alternatively, if such statements are unavailable, please provide copies of GSM's 2019 financial statements and provide the calculations of the FOH, SG&A, and profit rates based on GSM's financial statements. Provide the COP and CV calculations based on those rates.

*See* Letter from Sec'y of Commerce to The Bristol Group PLLC, *Petition for the Imposition of Antidumping Duties on Imports of Silicon Metal from Bosnia and Herzegovina: Supplemental Questions* (Jul. 6, 2020) (PR 16) at question 9.[2] [3]   Commerce's misleading description of its own requests, in an apparent effort to imply that Petitioners were somehow cherry-picking data they presented on the record, is entirely unwarranted.

      Given Commerce's specific requests, Petitioners' responses were entirely responsive. As previously discussed, the CV calculation in the Petition used, in part, production information (specifically, usage rates for materials, labor, energy, and packing) from GSM.  *See* Pls.' Br. at 5-6; *Silicon Metal from Bosnia and Herzegovina, Iceland, the Republic of Kazakhstan, and Malaysia:  Petitions for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended, on Behalf of Globe Specialty Metals, Inc. and Mississippi Silicon LLC* (Jun. 29, 2020) (PR 1-11) ("Petition").

      As also previously discussed in Plaintiffs' response to Commerce's supplemental questions, GSM *does not have standalone financial statements*.  *See* Letter from The Bristol Group PLLC to the Sec'y of Commerce, *Silicon Metal from Bosnia and Herzegovina: Petition Supplement* (Jul. 8, 2020) (CR 14/PR 19) ("Petition Supplement") at 11-12.

---

[2] Documents on the public administrative record in this proceeding are referred to in this brief by the abbreviation "P.R." followed by the document number assigned to them in the administrative record filed with the Court (*i.e.*, "P.R. __").  Documents on the confidential record are referred to by the abbreviation "C.R." followed by the document number (*i.e.*, "C.R. __").

[3] Plaintiffs have removed the bracketing from GSM's identity in this quoted language, and waive proprietary continued treatment of the company's name in this passage.

Moreover, even if Commerce's request had not specifically instructed Petitioners to use only GSM's financial statements but also requested using those of Mississippi Silicon LLC, even a cursory review of the record readily demonstrates that Mississippi Silicon LLC, like GSM, [                                              ], so its financial statements would not be appropriate for calculating the CV financial ratios.  *See* Petition at Exhibit I-43 (CR 1-11/PR 1-11); Petition Supplement at Exhibit Supp-II-6 (CR 14/PR 19).[4]

As the foregoing makes abundantly clear, Plaintiffs did not "refuse" to recalculate the CV-based normal value ("NV") using GSM's financial statements as requested; rather, they simply *could not do so* because GSM did not possess the requisite financial statement.  To demonstrate this, and to show their full cooperation, Plaintiffs submitted the financial statement of GSM's third-country parent company, Ferroglobe PLC ("Ferroglobe").  *See* Petition Supplement at Exhibit Supp-II-5 (CR 14/PR 19).

In doing so, Plaintiffs observed that Ferroglobe had suffered a loss during the period and, citing Commerce precedent, would thus not be an appropriate source for calculating the financial ratios used in the CV calculation.  *See* Pls.' Br. at 8-9.  This dovetails with the second point of this section.  While the cases cited as precedent in the Petition Supplement were several years old, they remained relevant.  Indeed, a recent Commerce decision underscores its longstanding and judicially upheld practice of excluding information from non-profitable companies in the CV calculation:

> Finally, we disagree with DSM's proposed alternative that Commerce set
> the CV profit rate to zero based on DSM's own experience. Commerce's
> practice, affirmed by the Court of International Trade (CIT) most recently

---

[4] The combined financial data in Exhibit I-43 show that the two companies collectively had [                                          ].  GSM's standalone data in Exhibit Supp-II-6 show that it had [                                          ], indicating that Mississippi Silicon LLC experienced [                                          ].

in *Husteel Co. v. United States*, is to exclude from the profit calculation any information from companies that record losses or zero profit.

*Magnesium From Israel: Final Affirmative Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 65,781 (Nov. 29, 2019) and accompanying Issues and Decision Memorandum at 19, citing *Husteel v. United States*, 180 F. Supp. 3d 1330, 1346 (CIT 2016), and *Notice of Final Determination of Sales at Less Than Fair Value and Termination of Critical-Circumstances Investigation: Electrolytic Manganese Dioxide from Australia*, 73 Fed. Reg. 47,586 (Aug. 14, 2008) and accompanying Issues and Decision Memorandum at 5-6, which in turn cites to *Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol From the Republic of Korea*, 68 Fed. Reg. 47,540 (Aug. 11, 2003), and accompanying Issues and Decision Memorandum at Comment 1.

Commerce's practice in this regard is grounded in language in the SAA, which recognizes that "in most cases Commerce would use profitable sales as the basis for calculating profit for purposes of constructed value." *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994) ("SAA") at 840.[5]

In sum, despite Commerce's characterizations to the contrary, Plaintiffs did not "refuse" to do anything that Commerce requested, but instead explained that the information Commerce was seeking either did not exist, or based on Commerce's own expressed decision-making, was inappropriate to use in the CV calculation in the Petition.

---

[5] Importantly, the SAA makes no distinction between calculating profits for constructed value during the initiation phase and during the rest of an investigation; it is unclear how Commerce can support taking different approaches to the same statutory provision during initiation versus the rest of a proceeding.

If any party failed to do something during the initiation stage, it was Commerce, when it refused to follow its own long-established practice.  Indeed, Commerce disavowed its practice (spanning at least 16 years, and arguably, back to 1994) without any precedential support when it unilaterally and erroneously used Ferroglobe's financial statements to calculate the CV financial ratios, despite the fact that Ferroglobe experienced a loss during the relevant fiscal year. Commerce's incomplete and inaccurate recitation of the facts here is surprising and reflects a highly flawed reading of the record.

## II.   COMMERCE HAS MISCONSTRUED KEY RECORD FACTS AS THEY PERTAIN TO FERROGLOBE AND ELKEM

Commerce states that, in the absence of in-country information, it prefers to rely on a petitioner's own data for initiation purposes, describing a "practice of relying on a petitioner's own data for initiation purposes in the absence of in-country information, as well as Commerce's preference for not using third-country financial statements to calculate constructed value profit and selling expense ratios."  *See* Def.'s Br. at 9-10 (citing, *inter alia*, *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 23,002 (Apr. 24, 2020), and accompanying Indonesia Initiation Checklist at 9 (using a U.S. producer's financial statements); *Carbon and Alloy Steel Wire Rod from Belarus, Italy, the Republic of Korea, the Russian Federation, South Africa, Spain, the Republic of Turkey, Ukraine, United Arab Emirates, and United Kingdom: Initiation of Less-Than-Fair-Value Investigations*, 82 Fed. Reg. 19,207 (Apr. 26, 2017), and accompanying United Arab Emirates Initiation Checklist at 9-10 (using a U.S. producer's financial statements)).

Taken at face value, none of the above supports Commerce's decision to use Ferroglobe's financial statements.  First and foremost, Ferroglobe was not a petitioner, GSM was.  Moreover,

in the two cases cited above by Commerce, it used the financial statements of U.S. producers, not

the U.S. producers' third-country parent companies.  In the *Mattresses from Indonesia* case, the

U.S. producer was Tempur Sealy, while in the *Wire Rod from the UAE* case, the U.S. company's

identity was treated as proprietary information.  Furthermore, not only were both companies

actually located in the United States, unlike Ferroglobe, but they were also both profitable, also

unlike Ferroglobe.  It is surprising that Commerce omitted these details, despite their relevance.

Commerce then attempts to dismiss the fact that Ferroglobe, like Elkem ASA ("Elkem"),

is also located in a third country.  Commerce argues:

> At most, however, this argument only applies to the second rationale
> (concerning Commerce's preference to not rely on third-country financial
> statements)—not the first (concerning Commerce's preference to use
> petitioners' own financial statements).  In any case, this argument attempts
> to gloss over very real differences between Ferroglobe and Elkem.

*See* Def.'s Br. at 10-11.  Plaintiffs understand that during initiation Commerce ideally prefers to

use a financial statement of a producer of comparable merchandise in the country under

investigation, or, failing that – regardless of the statute – the financial statement of a U.S.

producer whose data were used elsewhere in the CV calculation (as GSM's usage rates were for

the CV calculation in the underlying investigation) during initiation.  Setting aside the legality of

the latter approach, in the underlying investigation, however, Commerce did not use *either* a

Bosnian producer *or* a U.S. producer as the financial surrogate.  While Commerce indirectly

alludes to the fact that Ferroglobe is a third-country company (like Elkem), it implies that using

<u>Ferroglobe's</u> financial statement meant that it was following its preference for using a

<u>petitioner's</u> financial statement.  Clearly, it was not, because, again, Ferroglobe was not a

petitioner.[6]  Thus, Plaintiffs' argument plainly applies to both the first and second rationales,

rather than just the second, as Commerce contends.

Commerce further attempts to justify its use of Ferroglobe's data by arguing that because

it is the parent company of GSM, doing so links the financial ratios to the other CV data.  *Id.* at

11.  In certain circumstances, Plaintiffs can appreciate how striving for such a link might be

reasonable – for instance, if the U.S. producer's data accounted for a substantial or even

appreciable portion of the parent company's experience (unlike GSM and Ferroglobe), or if the

parent company (unlike Ferroglobe) was also located in the United States, or if the entity (unlike

Ferroglobe) was profitable.

Commerce then claims that Plaintiffs have not demonstrated anything arbitrary or

irrational about its reasoning for achieving a purportedly meaningful link to GSM's production

experience by using Ferroglobe's financial data.  *Id.*  Contrary to Commerce's statements,

Plaintiffs have identified multiple reasons why Commerce's reasoning was arbitrary and/or

irrational: (1) as discussed above, Commerce ignored its longstanding practice of declining to

use the financial statements of unprofitable companies; (2) GSM's financial data accounted for a

miniscule portion of Ferroglobe's overall activities reflected in its financial statements, meaning

that any link is, at best, tenuous (*see* Pl.'s Br. at 20); (3) in straining to substantiate a link,

Commerce ignores the countervailing fact that a contributing factor to Ferroglobe's

unprofitability was that [                                                                 ] to the

injurious dumping occurring, and that using such data would thus inherently distort the

---

[6] Commerce repeats the fiction that Ferroglobe was a petitioner later in its brief when it
addresses certain court cases cited by Plaintiffs, claiming that they did not "address whether
Commerce should have used third-country financial information over financial information
regarding a *petitioner* operating in the United States."  *See* Def's Br. at 15 n.3 (emphasis added).

calculation (*see* Pl.'s Br. at 27); and (4) Ferroglobe engages in a wide array of activities unrelated to the production and sale of identical or comparable merchandise (*see* Pl.'s Br. at 23).

On this last point, Commerce doubles-down on its meritless reasoning by stating that Commerce has no obligation whatsoever to use a surrogate financial company that only, or even primarily, is dedicated to the production of comparable or identical merchandise, and that it is unaware of any such authority or precedent stating as such.  *See* Def. Br. at 16.  Following Commerce's argument to its logical conclusion, if a Bosnian or U.S. company produced one percent silicon metal and 99 percent fairy dust, its financial experience would have been superior to the financial experience of Elkem, which, like Ferroglobe, is located in a third country, but in contrast, is wholly focused on the production of identical and comparable merchandise – and was also profitable.

In fact, similar to not using unprofitable or zero-profit companies, Commerce also has a practice of considering the overall business operations and product mix as they relate to surrogate CV profit companies:

> In evaluating the different alternatives under subsection (iii), we followed the analysis established in Pure Magnesium from Israel.  In *Pure Magnesium from Israel*, Commerce set out three criteria for choosing among surrogate data under section 772(e)(2)(B)(iii) of the Act: (1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products; (2) the extent to which the financial data of the surrogate company reflects sales in the home market and does not reflect sales to the United States; and, (3) the contemporaneity of the data to the POR.  In *CTV's from Malaysia*, Commerce added a fourth criteria of the extent to which the customer base of the surrogate and the respondent were similar (*e.g.*, original equipment manufacturers versus retailers).  These four criteria have been followed in subsequent cases to assess the appropriateness of using various financial statements on the record of a given case under subsection (iii).

*Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 84 Fed. Reg. 71,372 (Dec. 27, 2019) and accompanying

Issues and Decision Memorandum at Comment 1 ("*Oman Nails 2017-18 AR*") (emphasis added).

Commerce used the "similarity of business operations" criterion to dismiss two Omani

companies as options because they were involved with dissimilar products. *Id*.

More to the point, the authority that Commerce could not seem to locate exists in the

plain language of the statute, which describes several alternative sources of the data that may be

used to calculate NV:

> if actual data are not available with respect to the amounts
> described in subparagraph (A), then—
>
> (i)   the actual amounts incurred and realized by the specific exporter
>        or producer being examined in the investigation or review for
>        selling, general, and administrative expenses, and for profits, in
>        connection with the production and sale, for consumption in the
>        foreign country, of merchandise that is in the same general
>        category of products as the subject merchandise,
>
> (ii)  the weighted average of the actual amounts incurred and realized
>        by exporters or producers that are subject to the investigation or
>        review (other than the exporter or producer described in clause
>        (i)) for selling, general, and administrative expenses, and for
>        profits, in connection with the production and sale of a foreign
>        like product, in the ordinary course of trade, for consumption in
>        the foreign country, or
>
> (iii) the amounts incurred and realized for selling, general, and
>        administrative expenses, and for profits, based on any other
>        reasonable method, except that the amount allowed for profit
>        may not exceed the amount normally realized by exporters or
>        producers (other than the exporter or producer described in
>        clause (i)) in connection with the sale, for consumption in the
>        foreign country, of merchandise that is in the same general
>        category of products as the subject merchandise.

19 U.S.C. § 1677b(e)(2)(B) (emphasis added).

As this shows, even under alternative (iii), the statute anticipates and assumes a

preference for "merchandise that is in the same general category of products as the subject

merchandise."

It is obvious, and we submit axiomatic, that a closer match in terms of production and sales experience is a better choice.  Nonetheless, Commerce seems to think it is irrelevant that Ferroglobe's overall financial experience reflects significant interests in a variety of entirely non-comparable business activities such as timber farms, manganese-based alloy production, quartz and coal mining, and hydroelectric power activities.  *See* Petition Supplement at Exhibit SUPP-II-5, at pages 8, 11 (PR 19).  As with using an unprofitable company's financial statement, using the financial statement of a company involved to a substantial degree in non-comparable business interests distorts the CV calculation.

Indeed, Commerce's recognition of preferring a close match in terms of a surrogate financial company's experience, especially with regards to capital structure, is evident in its determinations.  "{I}t is Commerce's practice to rely on companies that have a similar capital structure for surrogate valuation purposes . . .."  *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 36,102 (Jul. 8, 2021) and accompanying Issues and Decision Memorandum at Comment 3.C. (p. 31) ("*Vietnam Fish Fillets 18-19 AR Final*") (citing *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Sixth Antidumping Duty Administrative Review and Sixth New Shipper Review*, 76 Fed. Reg. 15,941 (Mar. 22, 2011), and accompanying Issues and Decision Memorandum at Comment IV.A.; and *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results and Partial Rescission of the Seventh Antidumping Duty Administrative Review*, 77 Fed. Reg. 15,039 (Mar. 14, 2012)).

Certainly, the capital structure of a multinational conglomerate headquartered in a third country and involved in an array of business activities unrelated to the production and sale of

comparable/identical merchandise will be materially different than that of a producer of silicon metal and other comparable merchandise.  This is yet another reason that Elkem's financial statements represent a superior source for calculating the financial ratios for factory overhead, selling, general, and administrative expenses, and profit.

III.   **COMMERCE RELIES ON OVERSTATED ADMINISTRATIVE PRECEDENTS THAT DEALT WITH DIFFERENT FACTUAL AND TEMPORAL CIRCUMSTANCES**

Commerce justifies its decision to use Ferroglobe's financial statements instead of Elkem's during the initiation phase by citing two cases, despite the fact that these present distinct circumstances than those in the underlying investigation.  *See* Def.'s Br. at 18-20.  Commerce cites these two cases to support its point that it has changed its practice and now will never (apparently under any circumstances) revisit an initiation margin.  In contrast to the instant appeal, the first of these cases, *Steel Wheels from China*, involved a situation where Commerce declined to revisit a sound, properly calculated initiation margin calculation to yield a revised, higher AFA rate *using surrogate value data submitted later in the investigation*.  *See Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 Fed. Reg. 32,707 (Jul. 9, 2019) (*Steel Wheels from China*), and accompanying IDM at Comment 1.

The second case, *Aluminum Wire and Cable from China*, dealt with a similar situation to the first, in which Commerce declined to revisit an initiation margin using new information developed later during the course of the investigation.  *See Aluminum Wire and Cable from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 58,134 (Oct. 30, 2019) (*Aluminum Wire and Cable from China*), and accompanying IDM at Comment 1.

As previously discussed, both of these cases are inapposite. *See* Pl.'s Br. at 29-30. In both instances, parties had submitted additional information later during the investigation and then requested Commerce to revisit a properly calculated initiation margin. Plaintiffs in the instant appeal are not requesting that Commerce revisit a properly calculated initiation margin using later-developed information. Rather, Plaintiffs request that Commerce correct a mistaken recalculation, using information that has been on the record from the very outset, and which Plaintiffs have persuasively demonstrated is superior in numerous respects to that used by Commerce. This Court has held that Commerce should "relate a relevant and contemporaneous factual predicate to the particular period of investigation, not merely to avoid the appearance of ossification of administrative practice, but also as a necessary part of the particularized findings that will suffice for the purpose of the substantial evidence standard of review." *See Gold E. Paper (Jiangsu) Co. v. United States*, 991 F. Supp. 2d 1357, 1365 (Ct. Int'l Trade 2014). Arguably, Commerce failed to do so in the underlying investigation, and again in this appeal.

## IV.   COMMERCE HAS IGNORED OR MISAPPLIED THE INTENT OF THE STATUTORY LANGUAGE

Commerce dismisses Plaintiffs' observation that, because the statute establishes a profit cap, it inherently assumes that Commerce will rely on a source that does not have a loss or zero profit. *See* Def.'s Br. at 13. The agency argues that a basic canon of statutory interpretation weighs in the opposite manner: because the statute explicitly sets an exception capping the amount of profit that can be included from surrogate financial statements, the absence of an exception in the form of a profit floor means that there is no minimum profit requirement in surrogate financial statements. *Id.* Commerce's interpretation is not simply curious, but baffling.

13

As an initial matter, as a matter of basic dictionary definition, "profit" is "the financial benefit realized when revenue generated from a business activity exceeds the expenses, costs, and taxes involved in sustaining the activity in question." *See* https://www.investopedia.com/terms/p/profit.asp.  In other words, "profit" is a positive amount, as opposed to a "loss" or "break even."

When the actual data for CV financial ratios are unavailable, as is the case here, 19 U.S.C. § 1677b(e)(2)(B)(iii) provides that Commerce may use "the amounts incurred and realized for selling, general, and administrative expenses, and for <u>profits</u>, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers" (emphasis added).  The statute refers to "profit," not "loss," "break even," or, perhaps more to the point, the neutral "financial performance."[7] Moreover, the SAA reflects the clear expectation is that Commerce will base CV profit only on profitable sales, much less on a company that experienced an overall loss.  *See* SAA at 840. Indeed, this has been its consistent practice for at least several years, as discussed above.

Moreover, this principle is consistent with the very notion of "*normal* value."  A company whose sales are consistently made at a loss is not operating "normally" and will cease to be a company; its financial experience would by definition, not be "normal."  In a standard AD calculation, Commerce recognizes this when it disregards home market sales made below the cost of production in its calculation of NV.  *See* 19 U.S.C. § 1677b(b)(1).  The same notion applies when Commerce is in "any reasonable method" territory.

---

[7] Similarly, in AD calculation parlance, the latter part of this subsection is colloquially referred to as the "CV profit cap", not the "CV loss cap", "CV break even cap" or the "CV financial performance cap".

Commerce makes another error in its statutory analysis when it states that "the Trade Preferences Extension Act of 2015 made clear that, in applying an adverse inference in selecting among the facts otherwise available, Commerce 'is not required' to demonstrate that the 'dumping margin used' 'reflects an alleged commercial reality of the interested party' for 'any' purpose." *See* Def.'s Br. at 16, citing 19 U.S.C. § 1677e(d)(3).

As an initial matter, Commerce's error arose during the initiation stage. Commerce was not applying an adverse inference at that point in the investigation. Its duty was to evaluate, fairly and objectively, the information within the Petition to determine if it met the initiation threshold. It was only later in the case, when R-S Silicon D.O.O. ("R-S Silicon") indicated it would not participate, that adverse inferences came into play.

Additionally, Commerce ignores the genesis of the updated statutory language it cites, which came about due to certain instances in the preceding years, where this Court and the Court of Appeals for the Federal Circuit had, in some instances, overturned AFA rates that Commerce had applied, which the courts held did not reflect "commercial reality." In other words, the updated statutory language was devised so that Commerce would not have to go to extreme lengths to show that an AFA rate was not overly punitive and unreflective of a respondent's "commercial reality" had it otherwise cooperated. The updated language does not excuse Commerce from ignoring longstanding precedent and practice regarding the CV calculation. Using a demonstrably inferior and inapplicable source for the financial ratios in the CV calculation leads to a flawed calculation.

Lastly, and perhaps most critically, Commerce adduces no statutory authority for its disparate approach to selecting a surrogate financial company at the initiation stage versus later in the investigation. As discussed in its brief and above, at the initiation stage Commerce claims

15

a preference for using a source from the subject country, or failing that, a U.S. producer.  While

we can certainly understand the former, there appears to be no statutory grounding for the latter.

If anything, Commerce's application of the statute militates in the opposite direction.  For

example, Commerce has recently described its practice:

> As it is the U.S. market which is allegedly impacted by unfair pricing, we
> prefer not to rely on CV profit based predominantly on sales to the United
> States.

*Oman Nails 2017-18 AR*, 84 Fed. Reg. 71,372, Issues and Decision Memorandum at Comment 1.

Thus, there can be no logical reason why Commerce selected Ferroglobe as the surrogate

financial company for the CV financial ratios when its expressed reason for doing so was

because it was linked to the U.S. market.  In contrast, the financial statements of Elkem, which

represent information reasonably available to the petitioners (*see* 19 U.S.C. § 1673a(c)(1)(A)(i)),

are those of a profitable company, represent a producer with similar business operations, capital

structure, and financial experience to the respondent, and also a company whose sales are

primarily *not* to the U.S. market. *See Petition* at Volume II, Exhibit II-24 (PR 1-11).

## CONCLUSION

As discussed in Plaintiffs' opening brief, the record evidence, when fully and objectively

considered, clearly points to Elkem as the superior basis for the financial ratios.  Commerce is

entitled to substantial – but not unlimited – discretion when rendering its determinations.

Plaintiffs contend that, in the underlying investigation, Commerce failed to meet the "substantial

evidence" standard, even if it only had to amount to the admittedly low threshold of "more than a

mere scintilla."  Here, the mere scintilla upon which Commerce relied for selecting Ferroglobe

over Elkem was the fact that Ferroglobe's financial statements were tenuously linked to GSM's

financial experience, and thus preferable to certain other data relied upon in the Petition CV

calculation.  Against this weak link, Plaintiffs ask the Court to consider the multiple factors

discussed above countering Commerce's unsupported decision, which are summarized here:

- Commerce deviated, without any meaningful explanation, from its longstanding practice of not using financial data from unprofitable companies to determine CV;

- In the absence of any financial statement from a Bosnian silicon metal producer, Commerce couches its rationale for using Ferroglobe in its preference for using the data from one of the petitioners, knowing full well that Ferroglobe is not a petitioner and is located in a third country;

- Commerce ignores the fact that GSM's contribution to Ferroglobe's consolidated financial statements represent a tiny amount of Ferroglobe's activity;

- Commerce fails to acknowledge that using a CV profit rate of zero inherently distorts the resulting calculation and contradicts the intent of the statute as expressed in the SAA;

- Commerce ignores its preference for selecting a company whose financial experience would most closely mirror that of silicon metal producer;

- Commerce exaggerates the administrative precedent when dealing with initiation margins and relies on cases with differing circumstances; and

- Commerce plainly misapplies the statute in obvious ways using flawed reasoning and in disparate manners.

Considered overall, or even in part, these amount to a clear abuse of discretion. "Commerce

abuses its discretion . . . if it departs from a consistent practice without reasonable explanation."

*Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1342 (Fed. Cir. 2021).  Plaintiffs

respectfully request that this Court reverse Commerce's determination to use Ferroglobe's

financial statements for calculating the financial ratios used in the CV-based NV calculation, as

this decision was not grounded in sound practice. The Court should also find that Commerce

should instead use Elkem's financial statements because they best satisfy the criteria Commerce

typically considers.  Using Elkem's financial statements as the basis for the CV financial ratios

17

results in a margin of 39.00 percent, and the Court should instruct Commerce to corroborate this margin and assign it as the AFA rate for the uncooperative respondent, R-S Silicon.

Respectfully submitted,

Dated:  February 8, 2022

/s/ Adam H. Gordon
Adam H. Gordon, Esq.
Jennifer M. Smith, Esq.
Ping Gong, Esq.
Lauren Fraid, Esq.

THE BRISTOL GROUP PLLC
1707 L Street, NW
Suite 570
Washington, DC 20036
Tel.: (202) 991-2701
adam.gordon@bristolgrouplaw.com

*Counsel to Plaintiffs Globe Specialty Metals, Inc. and Mississippi Silicon LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chambers Procedure 2(B), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiffs' Reply Brief, as computed by The Bristol Group PLLC's word processing system Microsoft Word for Microsoft 365, is 5,315 words, less than the 7,000 word limit.

*/s/ Adam H. Gordon*
Adam H. Gordon

**THE BRISTOL GROUP PLLC**

*Counsel to Plaintiffs Globe Specialty
Metals, Inc. and Mississippi Silicon LLC.*

Dated:  February 8, 2022