Slip Op. 22-23

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - -x

GLOBE SPECIALTY METALS, INC. and          :
MISSISSIPPI SILICON LLC,
                                          :

                           Plaintiffs,
                                          :

                    v.                              Court No. 21-00231
                                          :

UNITED STATES,
                                          :

                           Defendant.
                                          :
- - - - - - - - - - - - - - - - - -x

Opinion & Order

[Plaintiffs' motion for judgment on the
 agency record denied; action dismissed.]

Decided: March 21, 2022

Adam H. Gordon, Jennifer M. Smith, Ping Gong, and Lauren Fraid, The Bristol Group PLLC, Washington, DC, for the plaintiffs.

Bret R. Vallacher, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, Brian M. Boynton, Acting Assistant Attorney General, Patricia M. McCarthy, Director, and L. Misham Preheim, Assistant Director, for the defendant.  Of Counsel W. Mitch Purdy, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.


AQUILINO, Senior Judge: Plaintiffs Globe Specialty Metals, Inc. and Mississippi Silicon LLC challenge the final determination of the International Trade Administration, U.S. Department of Commerce ("ITA"), sub nom. Silicon Metal from Bosnia and Herzegovina and Iceland: Final Affirmative Determinations of

<u>Sales at Less Than Fair Value and Final Affirmative Determination</u> <u>of Critical Circumstances for Iceland</u>, 86 Fed.Reg. 11720 (Dep't of Commerce Feb. 26, 2021) ("Final Determination"), Public Record ("PR") 70, and accompanying issues and decision memorandum dated February 22, 2021 ("IDM"), PR 61.

Jurisdiction to hear and decide plaintiffs' motion for judgment on the agency record, proffered pursuant to USCIT Rule 56.2, is based upon 28 U.S.C. §§ 1581(c), 2631(c).  The sole question raised is whether, in calculating normal value based on constructed value, ITA's use of financial statements pertaining to Ferroglobe PLC (Ferroglobe) was supported by substantial evidence and in accordance with the law.  <u>See</u> 19 U.S.C. §1516a(b)(1)(B)(i). For the following reasons, it was.

I

As domestic producers of silicon metal, the plaintiffs filed an antidumping duty petition with ITA, alleging that that metal, imported from Bosnia, was being sold in the United States at less than fair value.  <u>See</u> PR 1–11. Claiming inability to obtain financial statements from Bosnian producers, the petitioners estimated their costs of production using financial data from the Norwegian producer Elkem ASA, which had no connection to this

investigation apart from being a producer of silicon that the petitioners selected for this purpose.  PR 6 at 10-11.

ITA issued a deficiency questionnaire instructing the petitioners to recalculate the costs of production alleged in their petition using the financial statements of a Bosnian producer, or, if information regarding such a producer was not available, to recalculate based on the financial statements of one of the petitioning companies and to provide those statements. See PR 16 and Confidential Record ("CR") 12, at 4. In response, the petitioners provided the financial statements of Ferroglobe, the parent company of one of them.  PR 19, CR 14, Ex. "SUPP-II-5". Citing two decisions from 2002 and 2003, the petitioners refused to recalculate their alleged margin using their own financial statements on the grounds that Ferroglobe and its North American market segment experienced losses instead of profits in 2019. See id. at 10-12.  ITA then calculated an estimated dumping margin using Ferroglobe's financial statements.  Given the losses, ITA set the constructed value (CV) profit ratio at zero, resulting in a revised petition margin of 21.41 percent. See PR 24 at 8; IDM at 2.

ITA initiated investigation, setting the period therefor as April 1, 2019 through March 31, 2020, and assigning that percent as the estimated dumping margin for Bosnia.  Silicon Metal From

<u>Bosnia and Herzegovina, Iceland, and Malaysia: Initiation of Less-Than-Fair-Value Investigations</u>, 85 Fed.Reg. 45177, PR 23 at 2, 10.  The agency selected one mandatory respondent, "R-S Silicon D.O.O." ("RSS"), which represented the largest exporter of silicon metal from Bosnia during the period of investigation. <u>See</u> PR 28, CR 20.

　　　　Relevant to this action, RSS submitted its response to section A of the original antidumping questionnaire (<u>i.e.</u>, the section relating to general information), PR 43, CR 21, but it subsequently notified ITA of its intent not to respond further in the investigation, PR 44. The petitioners then requested that the agency apply total facts available with adverse inferences to RSS and assign an adverse facts available (AFA) rate of 39 percent to the company.  PR 46, CR 26.  In so requesting, the petitioners contended that "the Department typically assigns the highest estimated dumping margin from its initiation notice as the AFA rate in these situations, which is 21.41 percent for Bosnia and Herzegovina in this case," <u>id</u>. at 2. RSS's response stated that ITA should apply the highest estimated dumping rate stated in the Initiation Notice of 21.41 percent. PR 47.

In its preliminary determination, ITA applied total facts available with adverse inference to RSS and assigned an AFA rate of 21.41 percent based on the estimated weighted-average dumping margin relied on in the Initiation Checklist. <u>Silicon Metal from Bosnia and Herzegovina and Iceland: Preliminary Affirmative Determinations of Sales at Less Than Fair Value</u>, 85 Fed.Reg. 80009 (Dep't of Commerce Dec. 11, 2020), PR 69; Preliminary Decision Memorandum (PDM), PR 48, at 6; Initiation Checklist at 8. Because the adverse facts available rate was derived from information in the petition and the supplements to it, the agency corroborated the AFA rate, key elements of the export price, and normal value calculations, by examining information from various independent sources provided in the petition and its supplements. PDM at 7. Although the petitioners submitted a revised calculation in their supplement to the petition for an alleged margin of 39.00 percent, it was not calculated using the financial statements of the petitioners (or a parent company), as requested by ITA. <u>Id</u>. Based on the agency's inclination not to use statements from third countries to calculate constructed value ratios, ITA corroborated the recalculated rate of 21.41 percent found in the Initiation Notice, which it had calculated using Ferroglobe's financial statements. <u>Id</u>. at 8–9.

ITA issued its Final Determination and IDM in which the agency continued to use the margin from the Initiation Notice, which was calculated using Ferroglobe's financial statements, as the adverse facts available rate for RSS. IDM at 6, 11. ITA explained that data from Ferroglobe would have at least two advantages over data from the petitioners' hand-picked company. First, because "the petitioners calculated the cost of production based on their own experience," the agency "[found] it appropriate to base the CV ratios on that petitioner's parent company" so that the "usage rates and CV ratios have a link to the same source." Id. at 9. Second, ITA explained that it was "continu[ing] to not rely on third-party financial statements" and provided many examples of this practice. Id. at 9–10 n.48. It further explained that "[a]lthough the parent company is headquartered abroad, its financial statements include the data from the petitioner itself, making Ferroglobe's financial statements, at least in part, reflective of the financial data of that U.S. producer," whereas "Elkem's financial statements represent entirely third-country based data with no element of cost from either the country under investigation or a U.S. producer." Id. at 9.

ITA confirmed the accuracy and validity of the information underlying the calculation of the dumping margin used

in the Initiation Notice by examining source documents and
affidavits, as well as publicly available information.  Id. at 10.
Nothing in the record calls into question the validity of the
information supporting the export price and normal value
calculations provided in the initiation checklist.  Id.
Accordingly, the agency found that the use of the dumping margin in
the Initiation Notice of 21.41 percent was consistent with both the
Tariff Act of 1930, as amended ("Act"), and ITA's practice, and was
reliable for the purposes of the underlying investigation.  Id. at
10.

II

        The plaintiff-petitioners did not comply with ITA's
instructions to revise their calculations, which relied on
information regarding a non-party located in neither the home
country (Bosnia) nor the United States.  They now plead that this
court disregard ITA's discretion, ignore its well-established
practices, and overturn a decision with substantial evidence to
support it.  These arguments fail to overcome the standard of
review to which this proceeding is subject.  See 19 U.S.C.
§1516a(b)(1)(B)(I).  ITA acted well within its discretion in
applying a 21.41 percent dumping margin, and the court will not
substitute its judgment for that of ITA in choosing between two

fairly conflicting views.  See, e.g., Goldlink Indus. Co. v. United States, 30 CIT 616, 618, 431 F.Supp.2d 1323, 1326 (2006); see also Cleo Inc. v. United States, 501 F.3d 1291, 1296 (Fed.Cir. 2007) (improper to overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record").

        The plaintiffs do not contend that ITA failed to abide by a statute or regulation and do not contend that a factual determination it reached lacks a basis in the record (i.e., substantial evidence).  ITA's decision to resort to "adverse facts available" is uncontested here.  The dispute at bar only concerns choice of the AFA rate.  The statute and the regulation governing such determinations provide the agency with substantial discretion as to what sources it may use to establish such rate.  Accord PAM, S.p.A. v. United States, 582 F.3d 1336, 1340 (Fed.Cir. 2009) ("[ITA]'s discretion in applying an AFA margin is particularly great when a respondent is uncooperative by failing to provide or withholding information") (citing 19 U.S.C. §1677e); Statement of Administrative Action accompanying the Uruguay Rounds Agreements Act, H.R. Doc. No. 103-316 (SAA), at 840 (1994) (emphasizing the case-by-case nature of selecting sources by stating that it was inappropriate "to establish particular methods or benchmarks for

applying this alternative"). The relevant statutory and regulatory
sections provide that, in selecting from adverse facts available,
ITA "may" rely on information from (1) the petition, (2) the final
determination in the investigation, (3) any previous administrative
review, or "(4) any other information placed on the record." <u>See</u> 19
U.S.C. §1677e(b); 19 C.F.R. §351.308(c) (same). Because
Ferroglobe's financial statements are "other information placed on
the record," <u>id</u>. (see Petition Supplement, CR 14, at 29–238), the
"statute . . . expressly permitted [ITA] to turn to" them,
<u>Papierfabrik August Koehler SE v. United States</u>, 843 F.3d 1373,
1380 (Fed.Cir. 2016). Accordingly, the plaintiffs cannot and do
not show that ITA's decision was in violation of a statute or
regulation.

        Instead, plaintiffs' arguments rest primarily on their
interpretation of outdated agency practices, pursuant to which
ITA's purported preference for using financial statements from
profitable companies supposedly defeats a preference for using
financial statements from domestic, petitioning companies. In so
doing, the plaintiffs ignore ITA's explanations founded on its
current well-established practices, rely on inapposite decisions to
confer outsized importance to outdated practices, and attempt to
blur the distinction between a company having substantial business

in the United States and one having none.  These arguments lack merit.

Plaintiffs' overriding position appears to be that ITA abused its discretion.  See, e.g., <u>Goodluck India Ltd. v. United States</u>, 11 F.4th 1335, 1342 (Fed.Cir. 2021) ("[ITA] abuses its discretion . . . if it departs from a consistent practice without reasonable explanation").  The plaintiffs do not, however, establish that the agency's decision to use the 21.41 rate represents a departure from a consistent practice, much less an unexplained one.

Because financial information from a Bosnian producer was not available, ITA's potential sources from which to select an AFA in its investigation were limited. It could resort either to (a) financial statements from an entirely third-country producer, Elkem, or to (b) financial statements from the parent company of one of the (U.S. producer) petitioners, which they provided to ITA. IDM at 2.  Although the plaintiffs continue to argue that the agency should have exercised its discretion to use Elkem's financial statements for calculation of the constructed value financial ratios,[1] it determined that Ferroglobe's financial

_____

[1]  <u>See</u> Pls' Reply Br, p. 16.  The quality of this submission and the other papers filed by both sides herein obviates the need
(continued...)

statements were preferable because of (1) "[ITA]'s practice of relying on the petitioner's own data for initiation purposes in the absence of in-country information," id. at 10, and (2) ITA's general practice not to "rely on the third-country financial statements," id. at 9.   Accordingly, the agency selected the financial statement linked to a U.S. producer over the financial statements from a third-country producer.

      The plaintiffs do not persuade that ITA's decision was unreasonable.  As evidenced by the numerous other determinations it cited in the IDM, it frequently uses financial statements of a U.S. producer of comparable merchandise to calculate normal value based on constructed value for initiations when no in-country data are available.  See id. at 9-10 n.48, citing, inter alia, Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, 85 Fed.Reg. 23002 (April 24, 2020), and accompanying Indonesia initiation checklist at 9 (using a U.S. producer's financial statements); Carbon and Alloy Steel Wire Rod from Belarus, Italy, the Republic of Korea, the Russian

--------

   [1]   (...continued)
for oral argument, and the motion therefor can be, and hereby is, denied.

Federation, South Africa, Spain, the Republic of Turkey, Ukraine,
United Arab Emirates, and United Kingdom: Initiation of
Less-Than-Fair-Value Investigations, 82 Fed.Reg. 19207 (April 26,
2017), and accompanying United Arab Emirates Initiation Checklist
at 9–10 (using a U.S. producer's financial statements)).  The IDM
makes clear that this is done in accordance with agency practice of
relying on a petitioner's own data for initiation purposes in the
absence of in-country information, as well as ITA's preference for
not using third-country financial statements to calculate
constructed value profit and selling expense ratios.  Id. at 6, 10.

        The plaintiffs argue that Ferroglobe, like Elkem, "also
is located in a third country," so ITA's justification for using
information from Ferroglobe over Elkem is a "canard." Plaintiffs'
Motion for Judgment on the Administrative Record ("Pls' Br"), ECF
No. 19, at 4.  At most, however, this argument only applies to the
second rationale (concerning agency preference to not rely on
third-country financial statements) and not the first (concerning
its preference to use petitioners' own financial statements).  In
any case, this argument glosses over evident differences between
Ferroglobe and Elkem.  As ITA explained in the IDM, "[a]lthough the
parent company is headquartered abroad, its financial statements
include the data from the petitioner itself, making Ferroglobe's

financial statements, at least in part, reflective of the financial data of that U.S. producer." IDM at 9. The agency found Ferroglobe's financial statements preferable to Elkem's financial statements because the latter "represent entirely third-country based data with no element of cost from either the country under investigation or a U.S. producer." <u>Id</u>. Furthermore, because "the petitioners calculated the cost of production based on their own experience," and thus ITA is "applying usage rates from a petitioner's own experience," it would be "appropriate to base the {constructed value} ratios on that petitioner's parent company" so that "the usage rates and CV ratios have a link to the same source." <u>Id</u>. The plaintiffs have not demonstrated anything arbitrary or irrational about this reasoning.

The plaintiffs next argue that ITA's reliance on information from Ferroglobe violated its practice of not relying on financial information from companies that suffered losses. Pls' Br at 24–28. This argument fails for at least two reasons.

First, there is nothing in the statute that requires that ITA use financial statements showing a profit. In calculating normal value based on constructed value, it normally calculates a constructed value profit ratio using the preferred method under

section 19 U.S.C. §1677b(e)(2)(A) of the Act, i.e., based on the
respondent's own home-market or third-country sales made in the
ordinary course of trade. 19 U.S.C. §1677b(e). When the preferred
method is unavailable, ITA relies on one of the three alternatives
outlined in sections 19 U.S.C. §1677b(e)(2)(B)(i) through (iii).
They are: (i) the use of the actual amounts incurred and realized
by the specific exporter or producer in connection with the
production and sale of merchandise that is in the same general
category of products as the subject merchandise; (ii) the use of
the weighted average of the actual amounts incurred and realized by
exporters or producers (other than the respondent) that are subject
to the investigation or review in connection with the production
and sale of a foreign like product; or (iii) "the amounts incurred
and realized for selling, general, and administrative expenses, and
for profits, based on any other reasonable method, except that the
amount allowed for profit may not exceed the amount normally
realized by exporters or producers [other than the respondent] in
connection with the sale, for consumption in the foreign country,
of merchandise that is in the same general category of products as
the subject merchandise . . .." 19 U.S.C. § 1677b(e)(2)(B). The
plaintiffs do no demonstrate why ITA's selection was aberrant.

Second, the statute does not establish a hierarchy for selecting among the alternatives for calculating constructed value profit. <u>See</u> SAA at 840 ("At the outset, it should be emphasized, consistent with the Antidumping Agreement, new section 773(e)(2)(B) does not establish a hierarchy or preference among these alternative methods. Further, no one approach is necessarily appropriate for use in all cases."). Moreover, as explained in the SAA, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data." <u>See</u> <u>id</u>. at 840.  The court does not concur with the argument that the fact that the SAA did not "establish particular methods and benchmarks for applying this alternative" implies that ITA must use any third-country, third-party source a petitioner selects. <u>See</u> Pls' Br at 22.  ITA has discretion to select from any of the three alternative methods, depending on the information available on the record, and in this instance the information in the record only permitted it to select option three -- "any other reasonable method" -- because the only respondent in the underlying investigation was non-responsive. <u>See</u> <u>supra</u>. The plaintiffs argue that the fact that there is a "cap on the amount of profit that will be included" under this option "inherently assumes that the agency will rely on a source that does not have zero profit or a

loss", Pls' Br at 18, but a basic canon of statutory interpretation produces the opposite result: because the statute explicitly sets an exception capping the amount of profit that can be included from surrogate financial statements, the absence of a "profit floor" exception means that there is no minimum profit requirement among surrogate financial statements. See, e.g., Ventas, Inc. v. United States, 381 F.3d 1156, 1161 (Fed.Cir. 2004) ("Where Congress includes certain exceptions in a statute, the maxim expressio unius est exclusio alterius presumes that those are the only exceptions Congress intended.").

Be that as it may, the plaintiffs do not point to any authority for the proposition that ITA's preference for profitable companies[2] must triumph over its practice of using financial statements from U.S. producers when no in-country data are available. As explained below, plaintiffs' cases do not show ITA relying on third-country data for calculating constructed value when adequate financial information about U.S. producers was available. See Pls' Br at 21–22. Rather, the agency only used

---

[2]   For example, in Catfish Farmers of Am. v. United States, 33 CIT 1258, 1273, 641 F.Supp.2d 1362, 1378 (2009), the dispute was whether ITA was reasonable in choosing to use a profitable third-country seafood processor to derive surrogate financial ratios for a nonmarket economy company to the exclusion of another third-country seafood processor that was not profitable.

third-country financial statements when there were no financial statements covering home market sales or from a U.S. producer available on the record.  Id.  Here, however, ITA had record information available that was linked to one of the petitioning companies, which included data from a U.S. producer that could be used to calculate constructed value.  IDM at 2, 10.  Thus, none of those cases support plaintiffs' position.

They argue, largely based on EMD from Australia and PVA from Korea, that ITA has a practice of not selecting rates as adverse facts available when those rates were calculated using financial statements showing a loss.  See Pls' Br at 24–31. However, those cases do not show that ITA has a practice of prioritizing profitable financial statements from third-country producers over those of U.S. producers that show a loss when calculating constructed value for initiation.  In fact, in both instances, the agency ultimately relied on profitable financial statements from other producers in the country of investigation, and not financial statements from a third-country producer.  See Notice of Final Determination of Sales at Less Than Fair Value and Termination of Critical Circumstances Investigation: Electrolytic Manganese Dioxide from Australia, 73 Fed.Reg. 47586 (Dep't of Commerce  Aug. 14, 2008); Issues and Decision Memorandum at 5–6

(ITA chose to calculate constructed value based on an Australian producer with home market sales); <u>Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol From the Republic of Korea</u>, 68 Fed.Reg. 47540 (Dep't of Commerce Aug. 11, 2003); Issues and Decision Memorandum at Comment 1 (ITA used a Korean producer with home market sales as a surrogate company from which to select a reasonable constructed value profit rate).

Unlike in <u>EMD from Australia</u>, in the underlying investigation herein ITA did not have profitable surrogate financial statements from the country of investigation that could be used in calculating constructed value. IDM at 2. <u>PVA from Korea</u> likewise represented a different set of facts, in which ITA had a source for calculating constructed value that included both U.S. sales and home market sales in financial statements. <u>See PVA from Korea</u> at Comment 1. By contrast, in its investigation at bar, ITA was faced with the options of using either financial statements from Elkem, an entirely third-country producer, or financial statements from Ferroglobe, a parent company of one of the petitioning companies whose financial data included financial statements from a U.S. producer. IDM at 2, 9.

When ITA selects an alternative method for calculating normal value based on constructed value, its practice, in the absence of in-country information, is to rely on a petitioner's own data, in the form of financial statements from U.S. producers, over a third-party producer for initiation purposes. <u>Id</u>. at 9–10. Plaintiffs' citations to <u>Mid Continent Steel & Wire, Inc. v. United States</u>, 41 CIT ___, ___, 273 F.Supp.3d 1348, 1351–53 (2017), <u>aff'd in part</u>, 941 F.3d 530, 542–43 (Fed.Cir. 2019), and <u>Husteel Co. v. United States</u>, 40 CIT ___, ___, 180 F.Supp.3d 1330, 1343–46 (2016), <u>aff'd</u>, 710 Fed. Appx. 890 (Fed.Cir. 2018), are not to the contrary. <u>See</u> Pls' Br at 21–22. Neither of those cases addressed ITA's method of selecting an AFA rate, nor did they address whether the agency should have used third-country financial information over financial information regarding a petitioner operating in the United States. Here, ITA acted in accordance with its practice when it used Ferroglobe's financial statements, which were the only fully audited ones provided by the petitioners in response to the agency to calculate normal value based on constructed value. <u>Id</u>. at 2, 9, 10.

The plaintiffs next argue that Elkem's financial information is superior to Ferroglobe's because the latter reflects a company involved in a "wide range of business activities,"

including the production of silicon metal, whereas Elkem is a
"pure-play producer of silicon metal" like RSS. Pls' Br at 4.  As
a preliminary matter, and as the plaintiffs admit, "Petitioners
also provided separate financial data for GSM, a subsidiary of
Ferroglobe, which were used to compile the aggregated financial
data forming the basis of Ferroglobe's audited consolidated
financial statements." Pls' Br at 24.   More importantly, the
plaintiffs adduce no authority for the proposition that the
surrogate company must only (or even primarily) produce the product
at issue. Indeed, the Trade Preferences Extension Act of 2015 made
clear that, in applying an adverse inference in selecting among the
facts otherwise available, ITA "is not required" to demonstrate
that the "dumping margin used" "reflects an alleged commercial
reality of the interested party" for "any" purpose.   19 U.S.C.
§1677e(d)(3).   Accordingly, the relevance of Ferroglobe's other
operations is neither established nor apparent.   Plaintiffs'
elevation of their own statement that "all silicon metal producers
use essentially the same inputs and production process," Pls' Br at
23, would, at most, show that Elkem might be an acceptable (but not
mandatory) surrogate company.

       Finally, the plaintiffs argue that "[ITA]'s practice is
to select, as an AFA rate, the higher of: (1) the highest dumping

margin alleged in the petition, or (2) the highest calculated rate of any respondent in the investigation." Pls' Br at 15, 28–31. According to them, the fact that the sole mandatory respondent did not provide sufficient information to calculate a rate required ITA to accept the highest rate alleged in their petition. <u>Id</u>. However, this framework does not reflect the agency's current practice when making adverse inferences, which is to "select the higher of: (1) the highest margin stated in the notice of initiation; or (2) the highest margin calculated for any respondent." <u>Papierfabrik Aug. Koehler SE v. United States</u>, 843 F.3d 1373, 1380 (Fed.Cir. 2016) (noting that plaintiff did not disprove this practice). In other words, as explained in the IDM, ITA has a practice of corroborating the rate found in the Initiation Notice and applying that rate as adverse facts available. <u>See</u> IDM at 7–8. Notably, the petitioners even acknowledged that "the Department typically assigns the highest estimated dumping margin from its initiation notice as the AFA rate in these situations, which is 21.41 percent for Bosnia and Herzegovina in this case . . .." <u>See</u> <u>Silicon Metal from Bosnia and Herzegovina: Request for Application of Total Facts Available with Adverse Inferences to RSS</u>, PR 46, CR 26, at 2.

Plaintiffs' citation to <u>Welded Stainless Pressure Pipe</u> <u>from Thailand: Final Determination of Sales at Less Than Fair</u> <u>Value</u>, 79 Fed.Reg. 31093 (Dep't of Commerce  May 30, 2014), is not to the contrary because, in that case, the initiation margin was not adjusted from the petition margin, so there was no reason for ITA to make any distinction between the petition margin and the initiation margin.  <u>See</u> <u>Welded Stainless Pressure Pipe From</u> <u>Malaysia, Thailand, and the Socialist Republic of Vietnam:</u> <u>Initiation of Antidumping Duty Investigations</u>, 78 Fed.Reg. 35253 (Dep't of Commerce  June 12, 2013) (initiation notice accepting that the "estimated dumping margins for welded stainless pipe from Thailand range from 23.77 percent to 24.01 percent"). Notably, in that case was cited a related ITA decision in which the margins alleged in the petition had been "adjusted at initiation," and the agency ultimately selected an even higher rate based on information obtained during the course of its investigation.  <u>See</u> Issues and Decision Memorandum, <u>Welded Stainless Pressure Pipe From Thailand:</u> <u>Final Determination of Sales at Less Than Fair Value</u>, 79 Fed.Reg. 31093 (Dep't of Commerce  May 30, 2014).  Here, the margin alleged in the petition was also "adjusted at initiation" in accordance with agency current practices.  As explained above, the plaintiffs

have not established that ITA was unreasonable in adjusting the
petition rate in arriving at the initiation rate.

        The other ITA decisions on which the plaintiffs now rely,
EMD from Australia and PVA from Korea —- which are from 2003 and
2008 —- represent a prior practice of the agency.  Under that
practice, it would revisit the initiation margin when selecting for
use as an AFA, potentially recalculating it using information later
obtained in those investigations or evaluating whether it was
sufficiently adverse. See IDM at 7–9. In each of those proceedings,
ITA recalculated the rates under the premise that rates initially
calculated based on financial statements showing a loss would not
be adverse, but would rather benefit the non-cooperative
respondents.  See Pls' Br at 26 (quoting EMD from Australia and
accompanying IDM at 6).

        That practice, however, has since been superseded by
ITA's current practice of not recalculating the initiation rate
when selecting it as adverse facts available.  Under current
practice, the agency seeks to evaluate and confirm the reliability
of the information presented in a petition at the time of the
initiation of an investigation, and then ITA only corroborates the
margin in the initiation notice when selecting an AFA rate. IDM at

7-8 (citing <u>Aluminum Wire and Cable from the People's Republic of</u> <u>China: Final Affirmative Determination of Sales at Less Than Fair</u> <u>Value</u>, 84 Fed.Reg. 58134 (Dep't of Commerce  October 30, 2019), and accompanying Issues and Decision Memorandum at Comment 1). Current policy and practice are based on the fact that ITA has no ability to evaluate whether the adverse facts available rate is sufficiently adverse when there are no participating respondents, there are no calculated rates, and there is no order in place. <u>See</u> IDM at 8 (citing <u>Certain Steel Wheels 12 to 16.5 Inches in Diameter</u> <u>from the People's Republic of China: Final Affirmative</u> <u>Determination of Sales at Less Than Fair Value, and Final</u> <u>Affirmative Determination of Critical Circumstances</u>, 84 Fed.Reg. 32707 (Dep't of Commerce  July 9, 2019), and accompanying Issues and Decision Memorandum at Comment 1 (<u>Steel Wheels from China</u>).

ITA has followed this practice now for over a decade, and has consistently stated that it does not revisit the initiation margin when selecting it for use as AFA. <u>See</u> IDM at 7-8 (citing <u>Certain Steel Grating from the People's Republic of China: Final</u> <u>Determination of Sales at Less than Fair Value</u>, 75 Fed.Reg. 32366 (Dep't of Commerce  June 8, 2010) (<u>Steel Grating from China</u>), and accompanying Issues and Decision Memorandum at Comment 2; <u>Aluminum</u> <u>Wire and Cable from the People's Republic of China: Final</u>

<u>Affirmative Determination of Sales at Less Than Fair Value</u>, 84 Fed.Reg. 58134 (Dep't of Commerce Oct. 30, 2019), and accompanying Issues and Decision Memorandum at Comment 1).  Further evidence of this change in practice since the determinations in <u>EMD from Australia</u> and <u>PVA from Korea</u> can be found in ITA's inclusion of language in the initiation notices for those two matters stating that it would consider alternative options for calculating profit if it became necessary to rely on the constructed-value-based margin from the petition for adverse facts available. <u>See</u> IDM at 7, n. 35.  This language is no longer included in ITA's initiation notices, however, and was not included in the Initiation Notice herein.

        In the investigation underlying this action, ITA took the same approach as it has in other investigations presenting similar circumstances, such as in <u>Steel Wheels from China</u>.  Like that matter, the administrative proceeding herein involved an investigation where no respondents participated, no order was in place, and there were no calculated rates that could be used to determine whether the adverse facts available rate would be sufficiently adverse in the context of a producer's actions over a period of time under the discipline of an order.  IDM at 8, n.38. In accordance with current practice and under such set of facts,

ITA corroborated the dumping margin found in the Initiation Notice, determined that the margin was reliable and had probative value, and thus was appropriate to use as an adverse facts available rate. Id. at 8–9.

In short, the practice exemplified in the decisions the plaintiffs cite is no longer current and has not been for many years.  Id. at 7–9.  This is demonstrated by the cases spanning over a decade that ITA referenced in the IDM as evidence of its current practice, which replaced the practice the plaintiffs rely on in their arguments.  Id. at 7–8 & n. 36, 38–40.  When it selects an alternative method for calculating normal value based on constructed value, ITA's practice, in the absence of in-country information, is to rely on a petitioner's own data, in the form of financial statements from U.S. producers, over a third-party producer for initiation purposes.  Id. at 9–10.  ITA thus used Ferroglobe's financial statements, which were the only fully audited financial statements provided in response to its request, to calculate normal value based on constructed value.  Id. at 2, 9, 10.  Contrary to plaintiffs' argument, it would have been against the agency's current practice to evaluate the margin contained in the Initiation Notice to determine whether it was sufficiently

adverse under the circumstances —- and there was nothing in the record to make this evaluation.  See id. at 7-9.

    To summarize, ITA acted in accordance with its current practice when it based the AFA rate on the initiation rate of 21.41 percent, which, as discussed above, was reasonably determined based on Ferroglobe's financial statements.  The plaintiffs at times appear to suggest that this rate was so low that RSS secretly wanted it to apply because it would be more favorable than the rate it would be assigned if RSS had participated.  See Pls' Br at 12, 14, 30 n. 7, 33.  However, ITA "is not required to determine, or make any adjustments to" a "weighted average dumping margin based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information."   19 U.S.C. §1677e(b)(1).  See Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed.Cir. 2003) (holding that ITA may apply an adverse inference for a respondent's "failure to cooperate to the best of respondent's ability, regardless of motivation or intent").

Court No. 21-00231                                                    Page 28

III

  In view of the foregoing, plaintiffs' motion for judgment on the agency record must be denied, and this action dismissed.

  So ordered.

Decided: New York, New York
     March 21, 2022


          /s/ Thomas J. Aquilino, Jr.
               Senior Judge